**SNAP–ON TOOLS CORPORATION,**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 13592.

United States Court of Appeals
Seventh Circuit.

July 30, 1963.

Harry C. Alberts, Chicago, Ill., Kermit N. Caves, Kenosha, Wis., Theodore A. Groenke, Chicago, Ill., John C. Brezina, Chicago, Ill. (Samuel Weisbard, McDermott, Will & Emery, Chicago, Ill., of counsel), for petitioner.

J. B. Truly, Asst. Gen. Counsel, J. Lane Morthland, Atty., Federal Trade Commission, James McI. Henderson, Washington, D. C., Gen. Counsel, for respondent.

Before HASTINGS, Chief Judge, and DUFFY, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This is a petition to review a cease and desist order issued by the Federal Trade Commission against Snap-On Tools Corporation, a Delaware corporation with its principal office and place of business located at Kenosha, Wisconsin. The order is based upon a Commission complaint charging petitioner with unfair acts and practices and unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.[1]

The issue concerns Snap-On's nationwide distribution system based on dealerships established by contract which the Commission found limited and suppressed competition by fixing resale prices, geographically restricting markets, limiting customers, and restricting dealers' rights to compete after ceasing to be dealers.

Snap-On is a large manufacturer and distributor of mechanics' hand tools and related equipment. Its complete line of tools comprises some 4,000 items for use in the mechanical trades, principally in the automotive and aircraft fields. Snap-On distributes its products through independent, territorially-franchised dealers who sell on routes out of mobile, walk-in trucks.

The Commission's complaint, issued on April 10, 1958, charges that petitioner's dealers were required to enter into a standard form, printed, bilateral contract, containing restrictive terms and conditions. Paragraph five of the complaint sets out the objectionable provisions of the contract.[2]

The complaint further alleges that petitioner has enforced the Paragraph Five covenants, and that petitioner sells or attempts to sell to some customers in direct competition with its dealers, and sells to some customers whom its dealers are restricted from selling. The complaint summarized the effect of the restrictions by charging that petitioner's distribution scheme unduly restrains trade in commerce.

In its answer, filed June 30, 1958, petitioner denied that its sales and distribution system violated the Act. It admitted that its dealer agreements had contained

1. 15 U.S.C. § 45(a) (1) reads:
"Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

2. Complaint, Paragraph Five: "Respondent [petitioner], before selling its products to retail dealers and as a continuing condition of selling to them, requires each dealer to enter into a standard form of written bilateral contract, entitled "Dealer Agreement", containing, among others, terms, agreements and conditions providing that:
   1. The dealer agrees that he will not sell any of the products purchased from the respondent at a price varying from the retail price fixed by respondent;
   2. The dealer shall resell respondent's products only within the geographical limits of the territory described in his agreement;
   3. The dealer shall not sell respondent's products to the certain person or firms specified by name in his agreement;
   4. The "Dealer Agreement" may be terminated by the company at any time, and at the termination of the agreement, whether by the respondent or by the dealer, the dealer agrees that he will not engage in a similar business within the state in which he had been selling respondent's products for one year after the termination.

the restrictions complained of, but alleged that the required practices and operations are fair methods of competition and are reasonable and necessary to protect its dealers, customers, and its property rights and tend to intensify competition in the sale of petitioner's products. The answer admitted that prior to January, 1958, the dealer agreement contained the provisions described in Paragraph Five of the complaint; it alleged, however, that the provisions, except the one providing for the establishment of restricted territorial limits for dealer sales, had been abandoned in practice long before the issuance of the complaint.

At the close of the introduction of evidence by counsel supporting the complaint, petitioner moved to dismiss for failure to establish a *prima facie* case. The hearing examiner considered separately the issues as to the legality of the restrictive covenants and practices disclosed by the record as of that date; he did not consider the over-all effect of petitioner's practices. He granted the motion to dismiss on the issues of restricted territories and restricted customer contracts, but denied it on the issues of resale price maintenance and the covenant prohibiting a terminated dealer from engaging in a similar competing business for one year in the state in which his former territory was located.

Counsel supporting the complaint appealed. The Commission vacated the examiner's order and remanded the proceeding, stating that "the complaint, in addition to challenging the legality of each of the [restrictive] conditions * * included in the contracts, strikes generally at the [petitioner's] over-all" sales distribution system, "and places in issue the broad question of whether the [petitioner's] entire method of doing business," including the terms of its dealer contracts, and "all of the acts and practices engaged in pursuant thereto, considered together, constitute a restraint of trade in violation of the Federal Trade Commission Act." It directed the examiner to consider the over-all effect of petitioner's method of distribution, and to determine whether petitioner's challenged practices considered together constituted an unlawful restraint on competition.

Upon remand petitioner introduced evidence in defense of the charges of the complaint.

Once again the hearing examiner considered the evidence, and made findings of fact; he thereupon rendered an initial decision dismissing the complaint.

Upon appeal by counsel supporting the complaint the Commission reversed the examiner, made its own findings and issued its order requiring petitioner to cease and desist from engaging in each of the challenged practices. The Commission filed an opinion which contained an admonition to the hearing examiner for having failed to consider the restrictive provisions of the dealer contract *in toto* rather than seriatim.

The facts covering the operations of Snap-On are important to a discussion of the findings of the Commission particularly in view of the Supreme Court's recent decision in White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), wherein it was determined that vertical allocations of dealer territory are not *per se* violations of the Sherman Act. Such a holding necessitates an inquiry into the reasonableness of Snap-On's dealer arrangements and precludes any automatic finding of illegality based merely on a finding that exclusive territories were assigned to Snap-On's dealers.

The nature of the mechanics' hand service tool business is such that regular calls on customers, at the customers' places of business, by route salesmen or dealers, are essential. Purchasers of such tools include mechanics, repair shops, manual workers and others, who purchase individual tools, generally in limited quantities and often on impulse, or because a special tool is required for a current job. Where expensive equipment is needed, the salesman or dealer usually rents or leases the equipment to the customer and makes periodic collections and calls for the purpose of serv-

icing and adjusting such equipment. A substantial portion of sales of mechanics' hand service tools is made on credit, and it is customary for the dealer or salesman to collect the purchase price in weekly or bi-monthly installments.

Because of the continual demand for newly designed tools, capable of performing operations on complex, ever-changing models of automobiles and machinery, on-the-spot, physical demonstration of such tools in the customer's place of business, and frequent assistance and guidance to the customer in the use and application of the tools is necessary, as is regular and uninterrupted availability of service and replacement parts for the items supplied.

With the tools and other types of mechanics' servicing equipment sold by Snap-On and its competitors, the sale of a tool establishes a continuing relationship with the mechanic-user. The mechanic expects such a relationship with his supplier and will deal elsewhere unless this relationship is established and maintained by frequent and regular calls upon him at his place of business. Also, rentals and installment sales and collections would not be feasible without such regular and continuous calls.

Snap-On products have been sold, from the inception of its business, almost exclusively by route salesmen and, later, by route dealers regularly and systematically calling upon automotive service, mechanics', and industrial establishments, where they demonstrate, service, repair, and sell tools; advise as to their use; and collect time payment accounts and rent payments on large equipment rentals.

Until 1950, Snap-On sold its products directly to the mechanic and industrial trade through route salesmen employed by the company. In 1950–51, however, Snap-On discontinued direct selling to these trades through its own employee-salesmen, and began distributing through independent, franchised dealers, who purchase tools from Snap-On's branch warehouses and, in turn, resell out of mobile, walk-in trucks covering routes in assigned territories. The territories are defined as a result of surveys and experience to make possible the quick, efficient service, necessary in a highly competitive industry. Most dealers own and operate walk-in trucks in which are contained an inventory of merchandise, repair and replacement parts, and facilities for Snap-On products, and on which is a sign bearing a "Snap-On" legend. During the initial stages of a dealer's franchise, by way of financial assistance, Snap-On sells to him on consignment. After a dealer builds up an account equal to the value of his inventory, the company sells to him on a cash basis. As financial assistance to the dealer, Snap-On accepts assignments of the dealer's accounts receivable in lieu of cash.

In recent years, Snap-On's dealer organization has consisted of approximately 900 dealers at any one time. There is a high rate of turnover among them. For example, in the short space of one and a half recent years, petitioner had a turnover of between 350 and 700 dealers. The dealers are encouraged to call on every potential account in their territories, including industrial firms,[3] and the degree of their success is directly proportional to the thoroughness with which they cover the routes in their territories and the amount and quality of service they render their customers. Customers are free to buy in any territory and from any dealer, and dealers are free to sell to any customer that wishes to purchase from them within their assigned territory.

Snap-On contends that its products are sold in two channels of distribution, namely, the "mechanic trade" and the "industrial trade." The dealers sell the mechanic trade exclusively. Certain industrial accounts are sold directly by Snap-On through industrial salesmen employed by the company although Snap-On insists that, for the most part, the dealers are also free to solicit this business.

3. Although certain accounts on occasion have been reserved exclusively for industrial salesmen employed directly by Snap-On.

It is contended by the General Counsel for the Commission that the four restrictive provisions of the dealer contract are part of an integrated distribution system, the purpose and effect of which is to prevent competition in the resale of Snap-On products at the dealer level.

The Commission treated each of the questioned provisions separately, but went on to say during the course of its opinion:

> "The examiner stated that the maintenance of exclusive territories by a seller is not unlawful per se but only if the practice forms a part of a general plan or scheme which is unlawful. The examiner concluded, "No such plan is involved here."

> "It is clear from the testimony of respondent's own officials, however, that the provision for exclusive territories was part of the overall distribution plan which encompassed all of the restrictions here involved, and was designed to prevent competition among its dealers. More specifically, exclusive territories buttressed the resale price maintenance provision by preventing all competition, including price competition, among respondent's dealers."

The Commission concluded that "although some of these practices *might not be illegal standing alone,* we believe it necessary in the public interest, and in the exercise of our responsibility to provide effective relief, that the order ban them individually at least until such time as their *collective effect* upon competition has been completely erased." (Emphasis added.) The General Counsel emphasizes this position in his brief by saying, "the primary inquiry is not whether a particular restraint upon an individual dealer is illegal *per se,* but rather whether the *combination of the restraints* imposed upon all of respondent's [sic] nationwide network of dealers tends to suppress competition in the distribution of its products."

We find nothing in the record that compels us to accept the Commission's conclusion that the restrictive provisions in the contract were employed by petitioner *in combination* in an effort to eliminate or restrain competition to the detriment of consumers. Except for the fact that the provisions are all found in one document, there is no evidence, let alone substantial, to show that these provisions were designed to be, or were employed as a *unitary device* to foster practices violative of Section 5 of the Act.

In the absence of such evidence, we think the hearing examiner had no choice but to consider these provisions seriatim and that he was correct in finding no "general plan or scheme" existing separate and apart from the restrictive provisions which in itself might be conceived of as an unfair act or method of doing business resulting from "combination of the restraints" (as argued by the General Counsel).

This being the situation we must then turn our attention to whether there is substantial evidence in the record to support a finding that any or all of the restrictive provisions in petitioner's agreements have the pernicious effect on competition attributed to them by the Commission. Only by a perusal of the record can any determination be made as to their individual purpose or competitive effect.

1. EXCLUSIVE TERRITORIES:

The dealer contracts in question provide:

> "The Company hereby assigns to the Dealer not as an agent, a non-exclusive franchise for the sale of its products only within the territory described below and under the conditions hereinafter outlined:"

There then follows in each agreement a description of the territory assigned to the individual dealer. Petitioner conceded, the hearing examiner found, and the record shows that the term "non-exclusive" means only that Snap-On reserves the right to sell to "industrial" consumers in the assigned territory. Accordingly there seems to be no question that both Snap-On and its dealers under-

stand (as the Commission found) that this provision restricts the geographical area where the dealer might sell petitioner's products to the territory described in the contract, although the contract leaves the dealer free to sell to and serve customers who come to him from outside his territory.

In White Motor, supra, the Supreme Court refused to equate a *vertical* arrangement by a manufacturer restricting the territory of his distributors or dealers to a horizontal arrangement among competitors to divide territory. The Court thus declined to extend the *per se* rule covering horizontal allocations of territory, Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), to vertical territorial allocations. The Court in White Motor ruled that the legality of territorial and customer limitations placed on independent dealers by a manufacturer should be determined only after a trial. Mr. Justice Brennan in a concurring opinion iterated the Court's holding by saying, "The crucial question whether, despite the differences in form, these [vertical] restraints serve the same pernicious purpose and have the same inhibitory effects upon competition as horizontal divisions of markets, is one which cannot be answered without a trial."

In the case at bar, a "trial" was had —a hearing by a trial examiner—followed by review and revision of his findings and conclusions by the Commission.

In its opinion the Commission said, " * * * our inquiry is not whether a particular restraint upon an individual distributor is illegal per se, but rather whether all of the restraints imposed upon all of respondent's dealers suppressed competition in the distribution of its products. Acts which may be lawful in themselves have long been held unlawful where they form part of a course of action unreasonably in restraint of competition."

The Commission then dealt with the exclusive territories provision of the contract and stated: "We conclude, there-fore, that respondent's system of exclusive territories *contributed* to the illegality of its over-all distribution plan." (Emphasis added.)

A study of the Commission's opinion convinces us that its condemnation of this provision is based on its inclusion as an integral part of an over-all scheme to restrain competition rather than its being individually violative of the Act.

Moreover we fail to perceive that the Commission branded the exclusive territories provision as a *per se* violation, although it did make this significant statement:

"We have here, therefore, a series of restrictive provisions imposed upon all distributors that have the same destructive effects on competition as the horizontal allocations of territory condemned in United States v. Addyston Pipe & Steel Co., 85 Fed. 271 [46 L.R.A. 122] (C.A. 6, 1898), and are no less unlawful."

The Commission then cited in a footnote the district court's decision in White Motor (later reversed by the Supreme Court). Thus if it could be said that the Commission considered the territorial provision individually, its oblique reference to White Motor indicates that it viewed a vertical territorial assignment as a *per se* violation of Section 5—not on a basis of underlying facts, but simply because of its existence as a term in a bilateral contract between a manufacturer and an independent dealer—a view rejected by the Supreme Court in White Motor.

In contrast to the Commission's sketchy treatment of the facts pertaining to the exclusive territories provision, the trial examiner discussed the facts fully, and demonstrated by them to his satisfaction, and to ours, that there are certain advantages to a manufacturer, such as petitioner, in requiring an exclusive territorial arrangement with its dealers which promotes (rather than suppresses) in a broad, meaningful way, competition between it and other manufacturers of similar products, and which therefore

justify a minimal curtailment of intra-brand competition among its dealers.

For that reason we quote the examiner at some length:

"Is the maintenance by respondent of exclusive territories for its dealers illegal? In the examiner's opinion it is not. The dealers, as already stated, operate and sell from motor trucks. Not only do they make periodic calls on customers; they extend credit, collect installment payments, adjust complaints, and replace tools and equipment found to be defective. In the case of certain equipment, they enter into rental arrangements with the customer and periodically collect the amount of rental due.

"Moreover, customers frequently go to respondent's branch warehouses and make purchases direct. In such instances the dealers are entitled to their profit on the sale. In the absence of exclusive territories it would be almost impossible to determine the particular dealer to whom the credit was due.

"In the circumstances there is merit in respondent's contention that the maintenance of exclusive territories is indispensable to the successful operation of its business; that "confusion and chaos" would result if it were forced to abandon the policy. In the absence of the maintenance of a very large corps of salesmen employees, the practice of exclusive territories for its dealers appears to be the only way in which respondent can be assured that sales territories will be adequately worked, that periodic calls will be made on customers, and that satisfactory service will be rendered customers."

It would appear that even the Commission was not completely convinced its position on this issue was correct. This is evinced by its proposed solution to a manufacturer's (such as petitioner) problems of adequate distribution of its products, when it said:

"Nor do we concede that our holding here will have the dire consequences envisioned by respondent and the examiner. There is nothing to prevent Snap-On from assigning areas of primary responsibility to its dealers and insisting that they provide adequate sales coverage and service within these territories. Similarly, any direct sales made by respondent's branch warehouses may just as easily be credited to the appropriate dealer if his territory is one of primary rather than exclusive responsibility. All this it may accomplish without suppressing or eliminating competition among its dealers."

We think petitioner's argument against this proposal is sound. It says that if the dealer contract is rewritten so as to describe each dealer's territory as a "primary zone of influence," and if Snap-On policed adequate sales and service coverage, it would in practice duplicate the effect of the existing provision and "would be a sterile exercise in language," because the dealers are free even under the existing provision to sell to any customers (regardless of the customer's permanent location) who wish to come to a dealer's assigned territory. If the Commission's proposal means less than this, we believe it would only tend to promote friction and misunderstanding among the dealers. What is actually meant by a "primary zone of influence," and who is going to be the roving interpreter of the term's meaning? We think these are pertinent questions which militate against the Commission's suggestion.

The facts in this case are virtually undisputed regarding the underlying reasons for Snap-On's insistence on exclusive territorial provisions in its dealer contracts. We believe that the explanations proffered are not only reasonable, but that the effects of the practice are not significantly anti-competitive.

Since there is no requirement in the contract for price maintenance (except in "fair trade" states under the provision of the McGuire Act, discussed below), interbrand competition is promoted rather than restricted under the facts appearing in this record. Certainly the facts fail to indicate that Snap-On's territorial arrangement was a conspiratorial device among petitioner and its dealers to horizontally limit competition among the dealers. This assumption, if it were advanced, is belied by the fact that within a year and a half there was a turnover of between 350 and 700 Snap-On dealers. Moreover it seems appropriate again to allude to the fact that dealers are free to sell to any customers seeking their services. There is lacking in the record evidence of any reprisal visited by petitioner on dealers selling to customers from without their territory or of any coercion by Snap-On compelling dealers to confine their sales to customers located within their respective assigned territories.

On the issue of reasonableness, it is well to bear in mind that we are not here concerned with a manufacturer in a monopolistic position vis-a-vis its interbrand competitors. There is no evidence in the records that patents or trade secrets enable Snap-On to monopolize tool sales. Rather, the evidence is that there are over eighty competing concerns in the hand tool industry and that "competitive conditions in the Hand Tools Industry are bitter and bloody." Noncompetitive activity on Snap-On's part in interbrand competition, price-wise or territory-wise, could cause it to be submerged by the other companies in the field, both large and small. Sound business judgment would not overlook this fact when assessing reasons for limiting "bitter and bloody" competition among intrabrand competitors.

In summary on this point, we are satisfied that the evidence shows that Snap-On's vertical territory franchises were prompted by reasonable business expectations, and that there is no substantial evidence when the record is considered as a whole to support the result reached by the Commission. This is so whether the Commission based its conclusions on the fact that (1) these franchises are significantly anti-competitive if considered separately or (2) these franchises form one of the links in a chain of restrictions imposed by petitioner on its dealers which results "in an over-all distribution plan * * * designed to prevent competition among its [petitioner's] dealers." We believe the record before us fails to demonstrate that petitioner's vertically imposed territorial franchises have "the same pernicious purpose and have the same inhibitory effects upon competition as horizontal divisions of markets, * *" 4

We are not impressed by the Commission's statement that:

> "Respondent's claimed justification of its exclusive territorial agreements is that the prevention of competition among its dealers is essential to the orderly marketing of its products. Be that as it may, the law is clear that the public is entitled to the benefit of competition on the dealer level."

The public is also entitled to keen competition among differing brands of products such as was sought to be promoted here (as the examiner found and the Commission did not dispute). Furthermore, we believe manufacturers should be encouraged by the workings of the antitrust laws to meet and promote competition of their products with those of competing brands, rather than to be hampered by those laws in the "orderly marketing of [their] products."

2. **Retail Price Fixing:**

Clause seven of the dealer agreement reads:

> "The Dealer agrees that he will not sell any of the articles purchased by him from the Company at a price varying from the retail price fixed by the Company. Retail prices may

4. Concurring opinion, Mr. Justice Brennan, White Motor Co. v. United States, supra.

be changed from time to time by the Company by written or telegraphic notice to Dealer. Such change in retail price shall become effective immediately unless the notice specifies otherwise. This paragraph of the Agreement shall be operative *only in those states in which so-called "Fair Trade Acts" are in effect.* (Emphasis added.)

Snap-On argues that this provision in its dealer agreement represents an attempt by it to take advantage of the exemptions of the Miller-Tydings [5] and McGuire Acts.[6]

The Commission found that petitioner prescribed retail prices on all resales made by its dealers, i. e., on their resales to both the mechanic trade and to the industrial trade. It arrived at this finding by a literal reading of clause 7 in the dealer contract and by discrediting petitioner's evidence that its resale price policy applied only to resales made by dealers to the mechanic trade. The Commission further found that petitioner and its dealers competed with each other in selling to industrial accounts and held that petitioner and its dealers were "retailers." Accordingly, relying upon United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); and Esso Standard Oil Co. v. Secatore's, Inc., 246 F.2d 17 (1st Cir.

1957), cert. den. 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), the Commission concluded that petitioner was "clearly barred from fixing the prices at which its dealers may sell to any customers."

Petitioner contends, on the other hand, that its resale price maintenance program applied only to resales by the dealers to the mechanic trade, and not to the industrial trade; that petitioner did not sell at all to the mechanic trade, and was not a "retailer" in respect to its sales to special industrial firms; and that since its fair trade provision did not apply to sales to any class of customers as to which petitioner competed with its dealers, its resale price provisions did not violate the McGuire Act exemptions to Section 5 of the Act.

The hearing examiner in his initial decision stated:

"[T]here is positive, unequivocal testimony from respondent's principal officers that there has never been any policy or practice of resale price maintenance as to industrial sales; that the provision in question in the agreement was never regarded as having any application whatever to such sales. It should also be noted that while the quoted provision did not except industrial sales, it does seem to have applied only to 'retail' sales, and it is very questionable

5. Miller-Tydings Act Amendment of Section 1, Sherman Act, 50 Stat. 693 (1937), 15 U.S.C. § 1.

6. McGuire Act Amendment of Section 5 of the Federal Trade Commission Act, 66 Stat. 632 (1952), 15 U.S.C. § 45(a)(2), which reads in part:
"(2) * * * Nothing contained in this section or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by

others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

\* \* \* \* \*

"(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers, or between producers or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. \* \* \* \*"

whether sales to large industrial plants, railroads, governmental agencies, etc. can properly be regarded as retail sales.

"On the whole, the greater weight of the evidence on this issue is in favor of respondent. In any event, as already indicated and as will be seen later, respondent no longer has any policy of resale price maintenance in connection with any phase of its business."

The Commission, in disagreeing with the examiner on this point said, "We also are reluctant to credit oral representations which seek to negative the plain meaning of this provision. * * *"

■ We find ourselves unable to dispose of the oral representations as easily as did the Commission. The findings of the Commission must be supported by substantial evidence on the record as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). That record is of necessity perused when otherwise legitimate conduct, ostensibly adopted under the remedial provisions of the McGuire Act, is to be branded illegal; the immediate observations of the hearing examiner as to compliance with the law are overturned; and the Commission substitutes its own findings as to illegality.

■ We are aware that resale price maintenance agreements, if not within the Miller-Tydings and McGuire Acts, are illegal per se. United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). It is also true, however, that a good faith attempt by businessmen to take advantage of price maintenance exceptions to the *per se* rule will not be struck down as illegal on the basis of a literal technical interpretation of the contract where the actual facts show that petitioner has in practice adhered to the boundaries of the amendment exemptions.

■ We are satisfied from the evidence that in the area in which Snap-On and its dealers compete, i. e., industrial sales, no price maintenance was practiced. The distinction in the areas of sales (industrial versus mechanic) propounded and practiced by Snap-On is reasonable and subject to sufficient definition to enable sound business practices based thereon to survive as fair competitive practices. Accordingly in the area covered by the fair-trade clause in practice (mechanic sales), there was no agreement to fix prices "between persons, firms, or corporations in competition with each other."

We deem insubstantial the lone testimony of a former branch manager of petitioner, who testified: "I would say they [clause 7 price maintenance provisions] pertained to everyone except the national accounts, who were given a discount. That's what we used them for, everyone." This lone witness' rather ambiguous testimony (Snap-On has more than 900 dealers) is inconsistent with the uncontradicted testimony in the record that dealers were encouraged to make sales to industrial accounts, to cut prices to those accounts where necessary to meet competition, and that if such prices had to be reduced so low that the dealer could not realize adequate profits, Snap-On would allow dealers an additional discount. There is no evidence that this policy was not followed in fair-trade states. The witness' comments as to his impressions, under the circumstances, fail to constitute substantial evidence in the face of the conflicting evidence fully credited by the hearing examiner. We agree that the evidence demonstrates a course of dealing by Snap-On completely inconsistent with the Commission's literal reading of clause 7.

3.   LIMITATION OF CUSTOMERS:

The Commission also found, overturning the finding of the hearing examiner, that "respondent in some instances prevented its dealers from selling to certain 'industrial' customers, reserving these accounts for itself." In

concluding that the hearing examiner was in error, the Commission said:

"The examiner found that in only one instance was such a restriction imposed by a dealer agreement, and that this did not constitute sufficient evidence to support the allegations of the complaint on this issue. It was made clear in the testimony of respondent's dealers, however, that similar restrictions upon the sale to particular customers were imposed by respondent in cases not specifically provided in the dealer agreements. Although the record does not reveal the extent of this practice, we believe sufficient evidence was introduced to indicate that it formed an integral part of respondent's unlawfully restrictive dealer system, and that in this context it should be prohibited by the order herein."

██ "Sufficient evidence" must at least be substantial, particularly where the practice being examined is ultimately to be collocated with other practices in order to establish an illegal course of conduct. The citations to the record in the Commission's brief show at best only an occasional oral understanding between a branch manager and a few dealers whereby the company reserved large industrial accounts for its industrial salesmen. The few instances cited all involved accounts that sound business practice would dictate were too large or complex for a normally trained dealer with his limited inventory to handle properly. Reasoned analysis of each instance leads us to the conclusion that at most a *de minimus* restraint on competition was involved and that the entire record fails to afford a substantial basis for the implied finding of the Commission that the practice was widespread or an integral part of an unlawfully restrictive dealer system.

4. RESTRICTIONS AFTER TERMINATION OF DEALER CONTRACTS:

The last of the contract provisions challenged by the Commission reads:

"It is understood and agreed between the Company and the Dealer that, in consideration of the execution and delivery of this agreement, the Dealer shall refrain from carrying on a similar business within the state or states in which he has been operating under this contract for one year from the date of termination thereof by either the Company or the Dealer."

The examiner found this provision a reasonable restriction as to time but concluded that the geographical limitation encompassing the entire state where the dealer had been selling was unreasonable because the dealers' territories are relatively small often comprising only one community or even part of a city. The examiner, however, also found that the entire restriction had been eliminated in a revised form of the contract adopted by the company in January, 1958, some two or three months prior to the issuance of the Commission's complaint and that in June, 1958, all outstanding agreements with dealers were amended so as to cancel this restrictive clause. He further found that only in two instances had any attempt ever been made to enforce this provision in the contract and that both instances had occurred in 1955.

The Commission disagreed with the hearing examiner's view that elimination of the seldom-used provision negatived any need for a cease and desist order. The Commission stated:

"Respondent's dealer agreements * * * may thus be terminated by the company upon violation by a dealer of the territorial, price or customer provisions, which we have already found unlawful. The restriction upon dealers' activities after termination provided a potent means of insuring compliance with these unlawful provisions. It is clearly an integral part of respondent's unlawful distribution system and should be enjoined by the order herein."

There is no evidence in the record indicating that Snap-On ever employed this restrictive clause in the contract for the purpose of compelling compliance with any of the other covenants of its

dealer contract. The record is barren of any suggestion that this covenant was a part of any over-all plan to restrict trade and competition. Neither the Commission nor its counsel cite any facts in the record showing any substantial restraint of trade resulting solely from this restrictive clause.

██ Restrictive clauses of this kind are legal unless they are unreasonable as to time or geographic scope; but even if this restriction is unreasonable as to geographic scope, we are not prepared to say that it is a *per se* violation of the antitrust laws. Nor can we lend our support to a Commission finding, lacking support in the record, that this provision was used as an enforcement club for the other provisions under attack in the Commission proceeding. As we have already held that there is no substantial evidence to support a condemnation of the other contractual provisions as being violative of the Federal Trade Commission Act, it stands *a posteriori* that under these circumstances the contract termination clause does not offend the Act.

### CONCLUSION.

██ We are forced to the impression that the Commission, without the benefit of White Motor, entertained a prejudgment on the basis of the contract itself that the exclusive territorial franchise provision was tied to the other restrictive clauses in Snap-On's dealer contract so

as to create an integral over-all distribution system which violated the Act, and that, regardless of any underlying reasons for the separate provisions or their over-all reasonableness, petitioner's dealer relationships are perniciously anticompetitive. This is evidenced by the somewhat petulant criticisms directed to the examiner by the Commission.[7] It is further evidenced, we think, by the skimpy factual findings made by the Commission and still more skimpy citation to record facts to support the conclusions contained in its opinion.

We hold there is no substantial evidence in the record as a whole to support the Commission's order. Rather, the record completely supports the examiner's findings and conclusions.

The Commission's order is set aside, and it is directed to dismiss the complaint.

HASTINGS, Chief Judge (dissenting).

With deference to the analysis of the record as extensively reviewed in the majority opinion, I feel compelled to dissent from the holding therein.

The majority holding is based upon its rejection of the findings and conclusions of the Federal Trade Commission and substitution therefor of the findings and conclusions of the hearing examiner. This calls into play a consideration of the relationship in law between the Commission and its hearing examiner.

---

7. The Commission's opinion reads in part:
   The Commission held, therefore, that the ruling of the hearing examiner "based on considerations relating to separate fragments of the broad issue so presented, rather than to the issue as a whole," was erroneous, and that the motion to dismiss the complaint should have been denied in toto. Accordingly, the case was remanded with the instruction that the question of whether the maintenance of exclusive territories and the restriction of the dealers' customers contribute to the illegality of the arrangement should be considered in its final disposition.

   This direction was ignored inexplicably,[2] in the initial decision of the examiner entered on remand, after the presentation of respondent's case. Despite the fact that his prior dismissal order

had been reversed by the Commission because he had followed such a procedure, the examiner again considered separately and seriatim, as if each existed in isolation, the legality of the various restrictions upon respondent's dealers. Concluding that the complaint had not been sustained as to any of these practices, with the exception of one which had been discontinued, he dismissed the complaint.

\*  \*  \*  \*  \*

[2] It should not be necessary to repeat here the elementary proposition that under no proper conception of the "independence" of a hearing examiner is he free to ignore or disregard applicable provisions and rulings of law, including judicial mandate and agency instructions.

After an exhaustive review of the relevant precedent on this subject, Professor Davis in his Administrative Law Treatise reaches a conclusion with which I find myself in agreement:

"The final distillation from the case law is that the primary fact-finder is the agency, not the examiner; that the agency retains 'the power of ruling on facts * * * in the first instance'; that the agency still has 'all the powers which it would have in making the initial decision'; that the examiner is a subordinate whose findings do not have the weight of the findings of a district judge; that the relation between examiner and agency is not the same as or even closely similar to the relationship between agency and reviewing court; that the examiner's findings are nevertheless to be taken into account by the reviewing court and given special weight when they depend upon demeanor of witnesses; and that the examiner's findings probably have greater weight than they did before the adoption of the APA [Administrative Procedure Act]." 2 Davis, Administrative Law, § 10.04, at 26 (1958).

In this respect, I believe the majority to be in error. I cannot say that the findings and conclusions of the Commission do not have substantial support in the record. There can be little dispute concerning the material facts in this case. No questions of credibility have been raised. The real controversy arises from the legal conclusions to be drawn from the evidence. I would credit the judgment and experience of the Commission over that of the hearing examiner.

It is agreed that the dealer contract in question provides for an exclusive franchise to the dealer for the sale of petitioner's products to the mechanic trade "only within the territory described below [in the contract] *and under the conditions hereinafter outlined.*" (Emphasis added.)

At the outset, by the language of the contract the exclusive territorial limitation is made contingent upon the observance of the other restrictions by use of the clause "under the conditions hereinafter outlined." This means to me, as the Commission determined, that the contract and the conditions outlined therein should be considered as an integral over-all nationwide sales distribution plan. The agreement should not be fragmented but is to be considered as a whole.

The four restrictions in the dealer contract under attack relate to exclusive territorial markets, customer limitation, resale price-fixing and a covenant prohibiting a dealer's right to compete after contract termination.

Of these four restrictions, only those concerning the exclusive territorial arrangements and the customer limitation present any genuine controversy.

With reference to price-fixing, petitioner submits "that the Hearing Examiner's finding that Petitioner had completely discontinued its policy of resale price maintenance and that there was no reasonable prospect of resumption was supported by the overwhelming weight of the evidence * * * [and that] the Examiner should have been sustained in dismissing the charge as moot." Petitioner eliminated the fair trade clause from its dealer contracts in June, 1958. The majority opinion here concedes that without the fair trade clause resale price maintenance agreements are illegal *per se.*

In June, 1958, petitioner also eliminated the restrictive covenant from its dealer contracts. It now argues that it had abandoned both the fair trade clause and the restrictive covenant and contends that both issues are moot.

Without engaging in a discussion of the issue of mootness and considering the many cases outlawing price-fixing generally, it is my conviction that the Commission acted within the wide discretion allowed when it ordered petitioner to cease and desist from these two practices.

The restriction concerning the limitation of customers appears both in the contract and in instances not specified therein. The majority rationalizes that the few instances cited were those of large industrial contracts and that an analysis of each instance shows at most "a *de minimus* restraint on competition." Believing as I do that the practice of reserving certain industrial customers to itself was a part of petitioner's integrated sales distribution plan, I conclude that we should accept the evaluation of the Commission concerning the effect on competition of this limitation and the necessity for its prohibition. It seems well settled that reasons of business convenience or necessity may not be accepted as legitimate grounds for avoiding the proscriptions of the Federal Trade Commission Act. 15 U.S.C.A. § 45. As Mr. Justice Clark pointed out in his dissent in White Motor Co. v. United States, 372 U.S. 253, 280, 83 S.Ct. 696, 711, 9 L.Ed. 2d 738 (1963), the restriction on the withholding of customers has been held "to be illegal as a contract between potential competitors not to compete," citing United States v. McKesson & Robbins, Inc., 351 U.S. 305, 312, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).[1]

We find in the exclusive territorial restriction a vertical arrangement by a manufacturer restricting the territory to be served by each dealer. The issue is whether such vertical arrangement can be equated with horizontal divisions of markets now held to be illegal *per se.* The recent holding in White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), requires us now to look at the record to determine whether the territorial and customer limitations are valid, a hearing thereon having already been held by the Commission. The majority in White Motor intimated no views on the merits of this controversy, merely holding that the legality of such vertical limitations "should be

determined only after a trial." Id. at 264, 83 S.Ct. at 702.

In his concurring opinion, Mr. Justice Brennan made two references to the Commission's final opinion in the instant case. Snap-On Tools Corp., FTC Docket No. 7116, 3 CCH Trade Reg. Rep. ¶ 15,546. In footnote 6, page 268, of 372 U.S., page 704 of 83 S.Ct., the reference is to "an elaboration and discussion of some of the factors which might enter such an inquiry." The second reference is to the consideration of the use of "an assignment of areas of primary responsibility to each distributor" as a lawful means of serving the legitimate business needs of the manufacturer, with less damage to competition, in lieu of the territorial limitations. White Motor Co. v. United States, supra, 372 U.S. at 271, 83 S.Ct. at 706.

The Commission's decision in the instant case was handed down prior to the Supreme Court's holding in White Motor. Unlike the Antitrust Division there, the Commission here chose not to contend for a *per se* rule but elected to prove its charges. We ordered and heard a reargument of this appeal after the Supreme Court's decision in White Motor. The voluminous record of the Commission hearing indicates compliance in that respect with the mandate in White Motor.

The Commission has evaluated the record and made its own findings and conclusions based thereon. I would credit the Commission's action in this regard rather than substitute for it the findings and conclusions of its hearing examiner, which the Commission rejected a second time.

Letting the Commission's action speak for itself, I would approve the Commission's findings and conclusions and enforce its order issued November 1, 1961, for the reasons generally stated in its unanimous opinion filed by Commissioner Elman.

---

1. In White Motor, there was no appeal from the holding that resale price-fixing is illegal.