LEKTRO–VEND CORP., a Delaware Corporation, Ann Stoner, as Administrator of the Estate of Harry B. Stoner, Deceased, and Stoner Investments, Inc., a Delaware Corporation,

v.

The VENDO CORPORATION, a Missouri Corporation.

No. 65 C 1755.

United States District Court, N. D. Illinois, E. D.

July 22, 1980.

James Hardgrove, Sidley & Austin, Barnabas Sears, Boodell, Sears, Sugrue, Giambalvo & Crowley, Chicago, Ill., for plaintiffs.

Earl E. Pollock, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., Wayne F. Weiler, Reid, Ochsenschlager, Murphy & Hupp, Aurora, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROSZKOWSKI, District Judge.

This is an anti–trust action filed in 1965 by plaintiffs, Lektro–Vend Corporation ("Lektro–Vend"), Harry B. Stoner ("Stoner"), and Stoner Investments, Inc. ("Stoner Investments") against defendant, the Vendo Company ("Vendo"). Plaintiffs allege that defendant's acquisition of Stoner Manufacturing Corporation (the predecessor of Stoner Investments), in 1959, violated sections 1 and 2 of The Sherman Act, 15 U.S.C. §§ 1, 2 and Sections 4, 7, and 16 of The Clayton Act, 15 U.S.C. §§ 15, 18, and 26.

For the reasons herein stated, this court awards a judgment in favor of defendant.

A bench trial was held in this case beginning in August, 1978 and concluding in September, 1978. The background findings of fact, conclusions of law, and an analysis and discussion supporting this decision are stated below.

## FINDINGS OF FACT [1]

### THE PARTIES

Plaintiff, Stoner Investments, Inc. ("Stoner Investments"), is a corporation organized and existing under the laws of the State of Delaware. It is a successor to an Illinois Corporation of the same name, which prior to June 1, 1959, was named Stoner Manufacturing Company.

Stoner Manufacturing Company ("Stoner Manufacturing") was an Illinois corporation engaged primarily in the manufacturing of candy vending machines.

Plaintiff, Harry B. Stoner ("Stoner"), was president and controlling owner of Stoner Manufacturing, now Stoner Investments, prior to his death in March, 1976. On October 1, 1976, Stoner's wife, Ann Stoner, administrator of his estate, was substituted as a party plaintiff in this case.

Stoner was president of defendant, Vendo Corporation's, Aurora Division (previously Stoner Manufacturing) from June 1, 1959 through June 1, 1964 and a director of Vendo from May 28, 1959 to April 21, 1964.

Plaintiff, Lektro–Vend Corporation ("Lektro–Vend"), is a Delaware corporation with its principal place of business in Aurora, Illinois. Lektro–Vend was first organized in September, 1963 as a manufacturer of candy and snack pastry vending machines.

Stoner Investments currently owns approximately 78% of the stock of Lektro–Vend.

---

1. Any finding of fact which may be more properly termed a conclusion of law shall be deemed a conclusion of law.

Defendant, Vendo Corporation, is a Missouri corporation with its principal place of business in Kansas City, Missouri. The principal business of Vendo is the manufacturing and selling of bottle and can soft drink vending machines, including pre-mixed Coca-Cola, to franchised soft drink bottlers. In addition, Vendo manufactures and sells general merchandise vending machines, coffee vending machines, milk vending machines, ice cream vending machines, hot canned food vending machines, cold food vending machines, and soft drink vending machines to vending operators. At various times, Vendo also manufactured and sold candy, pastry and snack vending machines as well as cigarette vending machines to vending operators.

## THE INDUSTRY

The parties agree that Stoner was a design genius in creating innovative vending machine products.

By 1959, Stoner Manufacturing's drop-shelf candy vending machine was the leading candy vending machine throughout the United States. As against other candy vending machine sales, its sales fluctuated between 71% of the market in 1955 and 31% in 1959.

By 1959, Stoner Manufacturing also manufactured and sold vending machines for instant coffee, hot canned food, hot sandwiches, and cigarettes. In addition, Stoner was at work on developing a console cigarette machine, a refrigerated sandwich machine, and a post-mix cold drink machine.

Stoner Manufacturing employed twelve to thirteen salesmen and sold vending machines throughout the United States. In early 1959, the company was also negotiating for the licensing of a company in England to sell its machines abroad, but the negotiations were unsuccessful.

From 1955 to 1959, Stoner Manufacturing's sales varied from a 6.8% share to a 4.2% share of the market of all U.S. vending

machine sales. Within the "Vendo-served" market,[2] in that same time period, Stoner Manufacturing's share varied from 7.2% to 4.4%.

Prior to 1959, Vendo was primarily a manufacturer of beverage and ice cream vending machines. It had approximately 112 company salesmen who sold throughout the United States and it exported its machines to 58 countries.

Vendo's sales and income after taxes for the calendar year ending December 31, 1955 through 1977 are set out in the following table:

| Calendar Year Ending December 31 | Sales | Net Income (Loss) |
|---|---|---|
| 1955 | $ 20,799,000 | $ 842,000 |
| 1956 | 42,076,000 | 1,660,000 |
| 1957 | 37,056,000 | 1,075,000 |
| 1958 | 29,410,000 | 973,000 |
| 1959 | 45,046,000 | 2,484,000 |
| 1960 | 61,244,000 | 3,153,000 |
| 1961 | 53,696,000 | 2,297,000 |
| 1962 | 55,343,000 | 2,898,000 |
| 1963 | 51,958,000 | 1,990,000 |
| 1964 | 63,538,000 | 3,503,000 |
| 1965 | 77,425,000 | 5,101,000 |
| 1966 | 90,577,000 | 6,460,000 |
| 1967 | 88,361,000 | 5,016,000 |
| 1968 | 99,931,000 | 4,605,000 |
| 1969 | 99,353,000 | 2,408,000 |
| 1970 | 90,748,000 | 2,110,000 |
| 1971 | 91,868,000 | 92,000 |
| 1972 | 110,794,000 | 2,573,000 |
| 1973 | 113,346,000 | 2,857,000 |
| 1974 | 88,374,000 | (3,134,000) |
| 1975 | 69,164,000 | (2,463,000) |
| 1976 | 83,370,000 | ( 857,000) |
| 1977 | 97,168,000 | (3,650,000) |

Vendo's share of all vending machine sales was 20.3% in 1955, 21.5% in 1956, 28.2% in 1957, and 28.4% in 1958. Its share of the "Vendo-served" market was 21.6% in 1955, 22.9% in 1956, 30% in 1957, and 24.3% in 1958.

Vendo researchers reported that Vendo commanded the following percentages of the markets in which it competed from 1959 through 1969; 35.6% (1959); 34.9% (1960);

2. According to Vendo's records, the "Vendo served market" encompassed all coin-operated vending machines for food, drink, and ciga-

rettes, with the exception of bulk confection venders and a few other inconsequential items.

26.6% (1961); 29.1% (1962); 26.4% (1963); 28.9% (1964); 32.4% (1965); 33.0% (1966); 31.4% (1967); 32.3% (1968); and 33.0% (1969).

As can be seen, during the time period most immediately relevant to this suit (1959–1966), Vendo controlled approximately 30% of the market in which it competed. In 1966, Vendo expected its share of market dollars to climb to 58% by 1971.

The vending machine industry experienced rapid growth and change in the years 1955 through 1966.

During that period there was a significant trend toward concentration within the industry with one–half the number of manufacturers existing in 1966 as existed in 1958. The 130 manufacturers in 1957 dwindled to 76 in 1963 and 66 in 1964. In 1964, 49 of the 66 manufacturers experienced sales over $100,000.

In 1964 only 16 manufacturers of vending machines for confections and food had sales in excess of $100,000; in 1964 only 8 of 12 companies manufacturing vending machines for candy bars had sales in excess of $100,000. This trend toward concentration throughout the vending machine manufacturing industry has continued through 1975. The 66 manufacturers of 1964 had dwindled to 44 by 1975. From 1963 to 1973, the number of manufacturers with sales of $100,000 fell from 54 to 31.

Also during the years 1955 through 1966, the number of locations available for the placement of machines increased and the number of operators in the business increased.

Additionally, development of new equipment was substantial.

The vending machine industry reached its peak in 1966 with sales of $216,518,000.

By 1966, the industry was approaching a point of saturation. Industrial construction declined, the number of locations available for the placement of machines decreased, and an increasing percentage of the new machines sold were for replacement of existing machines at existing locations rather than for new locations.

Customers for vending machines can be divided into two different classes: 1) franchised soft drink bottlers (e. g., the Coca–Cola Company), which purchase machines to vend soft drinks which they manufacture, and 2) vending service companies, known as "operators", which purchase vending machines for the sale of food, beverages, and other items typically manufactured by others, including vending machines for hot, cold, and frozen foods, dairy products, coffee, candy, pastry, snacks, ice, soft drinks, and cigarettes. Bottlers and operators conduct different types of businesses for different purposes.

Franchised soft drink bottlers are in the business of mixing, bottling, and selling, by whatever means, their brand–named soft drink. Bottlers purchase and operate bottle and can vending machines as only one means to sell their drink. Bottlers, in operating soft drink vending machines, are both seeking a profit and a means for creating a preference for their product by making their brand–name soft drink available in as many places as possible whether the location is profitable or unprofitable.

Operators, on the other hand, are companies solely in the business of purchasing vending machines, placing them on locations, loading them with products, and maintaining them in service. Vending operators operate machines solely for a profit, as they are not interested in establishing the brand name of any product they vend.

There are several types of operators that can be distinguished according to the type of institution served. "Street operators" serve small, public establishments such as gas stations, bowling alleys, bars, and restaurants. "Industrial operators", or "full–line operators", place their machines in locations such as factories, schools, and hospitals where virtually the same patrons are served every day.

Street operators, ordinarily operate the "4 C's" in vending machines–candy, coffee, cold drinks, and cigarettes and usually have two to four machines at one location.

Industrial operators will often times locate a bank of equipment at one location providing a full line of products. The machines placed within banks of equipment are generally larger in capacity and size and have less styling and more uniformity in appearance.

Street operators ordinarily have "console" machines which are smaller in size and capacity and are highly stylized and more distinctive in appearance.

Vending operator companies vary in size. There are national operating companies which are large publicly owned chains listed on the New York Stock Exchange with national or regional coverage. There are independent operators which do business in a smaller number of locations. Some independents are members of buying co-operatives, such as AVA. Additionally, there are some bottlers who are also vending operators. Those bottlers who are also operators generally conduct their vending operator business as a separate company or division with separate offices, books, personnel, and routes.

In 1958, almost all operators were entirely independent with Canteen Corporation being the only operator company with a national structure.

Beginning in the early 1960's, the industry experienced the growth of several national and large regional operators such as ARA, Servomotion, Macke, Interstate United, Automatique, and Autoviables. These operators engage in both the operation of vending machines and in manual food preparation and service on the location premises.

In the late 1950's and early 1960's, Vendo was interested in becoming a full–line manufacturer[3] of vending machine equipment. Vendo, in fact, successfully used the full–line marketing technique. Today, Vendo is not a full–line manufacturer.

Both full–line and non–full line manufacturers provide their customers with cosmetic devices for their equipment (such as grills, screens, panels, and headers) which permit their machines to be placed in banks with the machines of other companies.

The use of these cosmetic devices to provide uniform or matching appearances between the machines of different companies reduces somewhat the disadvantage of being a non–full line manufacturer.

Additionally, non–full line manufacturers often times join buying cooperatives in order to diminish the significance of being a non–full line manufacturer.

## THE SALE AND ACQUISITION

In 1955, Clarence Adelberg, Executive Vice President of Stoner Manufacturing, suggested to Elmer Pierson, Chairman of the Board of Vendo, that Vendo acquire Stoner Manufacturing. Stoner and Adelberg subsequently met with various Vendo officers in Kansas City to discuss this possibility. However, no agreement was reached at this time. Plaintiffs contend, and Vendo denies, that, during these negotiations, Robert W. Wagstaff, Executive Vice President and General Counsel of Vendo, threatened that, if Stoner did not sell, Vendo would put Stoner out of business.

Nevertheless, both parties agree that Stoner's subsequent decision to sell in 1959 was not prompted by any threat or action by Vendo.

In July, 1956, Vendo acquired Vendorlator Manufacturing Co. ("Vendorlator"), a manufacturer of bottle vending machines from Fresno, California. As a result of this acquisition, the FTC commenced proceedings against Vendo in 1957 charging that the acquisition would tend to substantially lessen competition within the sub–market of bottle vending machines in violation of Section 7 of the Clayton Act. Before a decision was reached, Vendo and the FTC entered into a consent decree requiring Vendo to secure advance clearance from the FTC before acquiring any other manufacturers of bottle vending machines.

By 1958, Vendo was contemplating possible future developments which included the

---

**3.** A full-line manufacturer is one that has a line including candy, pastry, snack machines, cigarette machines, coffee machines, cold drink machines, and hot and cold food machines.

introduction of an instant coffee machine, a fresh food machine, a hot canned food machine, a cigarette machine, and a candy vending machine incorporating stock rotation and product visibility.

In October, 1958, Bip Glassgold, Stoner Manufacturing's Vice President in charge of sales, again approached Vendo to explore the possibility of Vendo acquiring Stoner Manufacturing. Robert Wagstaff, who had become Chief Executive officer for Vendo in 1958, Henry Gaddis, Vendo's Chief Financial officer, and Elmer Pierson participated in the negotiations for Vendo. Harry Stoner, Joseph Lazzara, Controller of Stoner Manufacturing, Jack Steward, Bip Glassgold, and Everett Johnson, a Senior partner at Arthur Anderson & Co., participated on behalf of Stoner Manufacturing.

From Stoner's viewpoint, the proposed sale to Vendo was advantageous due to Stoner's health problems, the death of Stoner's close associate and Executive Vice President Adelberg, the strain on Stoner from running the firm alone, and the fact that each of Stoner Manufacturing's shareholders had Stoner stock as one of their principal assets. According to Stoner's affidavit:

> Vendo seemed to be a logical purchaser because no other prospective purchaser had any management people capable of running the business without being educated in the vending machine field. Vendo being experienced in that field will be able to take over with less assistance from me. I am interested in having the business continued by people who have capable management and who will continue to employ and be compatible with our present officers and employees and with a minimum of dislocation of business practices and employment security. I do not want to let the business just drift and carry on of its own momentum, because this cannot continue indefinitely and there is great risk of loss involved in such a program. I attribute our poor showing

in sales in 1958, and since, at least in part, to the management difficulties I have already described.

Vendo's purpose in acquiring Stoner Manufacturing was to expand its line of vending machines, principally through the acquisition of a proven candy machine. An internal Vendo memorandum of October 20, 1958 from Stevens to Wagstaff indicated that, although Stoner Manufacturing's 1958 sales had declined and although the company had certain weaknesses and a few unfavorable factors, Stoner was "the leading supplier" of candy and pastry machines as well as "a major factor in instant coffee equipment." Stevens concluded that the acquisition would be "a big step toward giving us a complete line of equipment." Additionally, Wagstaff reported to Pierson that two other vending machine manufacturers were negotiating with Stoner. Buckley from Vendo's marketing division had indicated that "if Stoner were to fall into the hands of a more aggressive competitor ... the entrance of Vendo into this particular market would be still retarded...."

On April 3, 1959, after extensive negotiations during which various proposals were discussed, Vendo and Stoner Manufacturing, both represented by counsel, entered into a contractual agreement whereby Vendo would purchase the assets of Stoner Manufacturing, including inventions, patents, drawings, designs, and research and development work.

Under the sale agreement, Vendo was to pay Stoner Manufacturing $3,400,000 in cash and deliver to it 60,000 shares of Vendo stock. The land and the property constituting the Stoner Manufacturing plant was leased to Vendo at a stipulated rental for ten years with an option of renewal for a like period.

Vendo was also given an option to purchase the property on or after December 31, 1961.[4] Vendo further agreed to pay to

---

4. As of December 31, 1961, Vendo exercised its option and purchased the land and property constituting the Stoner Mfg. plant. The option purchase price was $948,000, less prepayments made under the terms of paragraph (c) of Section 2 of the acquisition agreement. Such pre-

Stoner annually for a period of ten years, or until such time as it might exercise its option to purchase the plant, all profits in excess of $250,000 realized from the use of the assets being purchased. Any such amount paid by Vendo was to be credited toward the purchase of the plant. Vendo also agreed to pay, for a period of ten years, 25% of the income received from the foreign production of the machines being acquired.

The acquisition agreement contained the following restrictive covenant:

*Section 15.* From and after the closing the Company [Stoner Mfg. Corp.] will not own, directly or indirectly, manage, operate, join, control or participate in the ownership, management, operation or control of, or be connected in any manner with, any business engaged in the manufacture and sale of vending machines under any name similar to the Company's present name, and, for a period of ten (10) years after the closing, the Company will not in any manner, directly or indirectly, enter into or engage in the United States or any foreign country in which Vendo or any affiliate or subsidiary is so engaged, in the manufacture and sale of vending machines or any business similar to that now being conducted by the Company. The Company also agrees that during its corporate existence it will, without incurring any financial obligation, co–operate with Vendo to prevent the use by others of the names "Stoner" and "Stoner Mfg. Corp." in connection with any business similar to that now carried on by the Company and also agrees not to disclose to others, or make use of, directly or indirectly any formulas or process now owned or used by the Company.

Vendo and Stoner voluntarily sought pre–merger clearance of the acquisition by the FTC, and on May 14, 1959 the FTC sent their clearance letter.

In addition to the sale agreement, the parties executed an employment agreement on June 1, 1959 whereby Stoner agreed to serve as an officer, or in such other executive or advisory capacity as Vendo requested, consistent with Stoner's physical abilities, for five years at an annual salary of $50,000.00. Stoner also agreed to serve as a director of Vendo without additional compensation. As to Stoner's service, the employment contract provided that:

Stoner shall regulate his own hours of employment and shall determine the amount of time and effort which he shall devote . . ., it being understood that the value of Stoner's services to the Company [Vendo] are not measured by the amount of time or effort devoted to the business by Stoner but by the value of his advice and counsel in the operation of the Aurora, Illinois, facility, and his know–how, experience and reputation in the vending machine field.

The contract provided that Stoner's employment could be terminated in several ways: (a) Vendo "shall have the right to terminate . . . in the event of a substantial violation of the terms hereof by Stoner", (b) Stoner could terminate "in the event he shall feel that he is not physically able to perform his duties hereunder", or (c) if not terminated by either party, the employment would expire at the end of the five year term or on Stoner's death, whichever came first.

The employment agreement also contained a restrictive covenant which provided that:

5. During the term of this agreement and for a period of five (5) years following the termination of his employment hereunder, whether by lapse of time or by termination as hereinafter provided, Stoner shall not directly or indirectly, in any of the territories in which the Company or its subsidiaries or affiliates is at present conducting business and also in territories which Stoner knows the Com-

---

payments amounted to $301,082.07. Therefore, the balance of the option purchase price

amounted to $646,917.93.

pany or its subsidiaries intends to extend and carry on business by expansion of present activities, enter into or engage in the vending machine manufacturing business or any branch thereof, either as an individual on his own account, or as a partner or joint venturer, or as an employee, agent or salesman for any person, firm or corporation or as an officer or director of a corporation or otherwise, provided, however, that the Company, its subsidiaries and affiliates shall be excluded from the restrictions hereof and provided also that Stoner shall be permitted to own, hold, acquire and dispose of stocks and other securities which are traded in the investment security market whether on listed exchanges or over the counter.

The period of the non–competition covenants was the same period during which Vendo (a) had the option to purchase the Stoner Manufacturing plant, (b) was to pay out a specified share of profits from the use of the acquired assets, and (c) was to pay out a specified share of the income from the foreign production of the acquired machinery.[5] The term of the non–competition covenants was increased from 5 years to 10 years after Vendo received a proposal from Stoner that Vendo's then pending offer, which included a 5 year option and payout, be changed to include a 10 year option and payout. The increased term was proposed by Hillix, Vendo's outside counsel in response to Stoner's suggestion.

Vendo's press release announcing the Stoner acquisition to the trade stated that "[o]fficers of the Stoner firm will continue in their present capacities, . . . and there will be no change in the mode of operations."

Vendo prepared a letter, which Stoner signed, to be sent to Stoner's customers. That letter stated: "We do not anticipate any change in Stoner's basic operating policies. We will continue to serve you, our customers, with the same organization we had in the past. Officers of Stoner Manufacturing will remain unchanged with myself as President."

Another letter drafted by Vendo, and signed by Stoner, was sent to Stoner Manufacturing employees. That letter stated that an independent engineering department would be maintained in Aurora after the sale.

## THE BREAKDOWN OF THE PARTIES' RELATIONSHIP

Almost immediately after the closing of the acquisition transaction, Stoner became unhappy because he began losing control of his company.

Shortly after the closing of the sale, Vendo announced that the engineering and research departments of Stoner Manufacturing would be moved to Kansas City. Subsequently, new product research and development was moved to Kansas City, and Vendo's research and development head, Bobby Andrews, reviewed Stoner Manufacturing's development work and recommended that part of it be dropped.

Stoner was not consulted about these developments and he believed he had been relegated to "senior citizen status."

Within approximately three weeks of the closing of the sale, executive control of operations, sales, and finance was also transferred to Kansas City. None of Stoner's division executives would report to Stoner as president.

Wagstaff set up a meeting in Aurora on June 24, 1959. Stoner maintains that Wagstaff "fired" Stoner at this meeting and that the office of president of the Stoner Division was made "strictly advisory." Wagstaff stated that he told Stoner his job

---

**5.** On October 12, 1962, after differences of opinion had arisen between Stoner and Vendo as to their respective rights and obligations under the sale contract, Vendo and Stoner Investments entered into a compromise agreement. Under the terms of that agreement, Vendo paid Stoner Investments $78,757.02 and was thereby released from its obligation to pay a percentage of income received from foreign production of the machines it had acquired from Stoner. Vendo was also released from its obligations with respect to the collection of Stoner Mfg.'s accounts receivables.

as president was advisory only and Wagstaff stated that he had "no choice but to do what we thought right."

After this June meeting, the general manager of Stoner Manufacturing was to report only to Kansas City.

There were occasions when Vendo sought Stoner's advice. Elmer Pierson asked Stoner for his advice regarding coinage. Spencer Childers, who acted as "father confessor" for Vendorlator employees, asked Stoner's advice concerning a FIFO device in August of 1959. Also in August, Stoner was asked to assist in a union dispute which arose over Vendo's removal of some equipment from the Aurora plant.

One of Stoner's primary complaints was Vendo's failure to use Stoner's "design genius and experience" and their failure to put Stoner on Vendo's Products Planning Committee. Vendo stated that they would have put Stoner on the Committee if he had shown some interest in the operations of the company. According to Vendo's Wagstaff, the relationship between Stoner and Vendo broke down completely:

> ... [A]t the beginning we discussed the changes that we desired to make with him in the plant and got his viewpoint, but Harry felt our viewpoint was so contrary to his that it got to the point that the discussions were just completely incompatible, and there was no point to having them. They outraged him and got him upset, and so those things by attrition just sort of phase out, but not by policy. I think, thought, and still think that one of the difficulties in anything of that sort is getting people to agree, and I think Harry could have made quite a contribution to the operation if he had not been so irritated at us, which he was.

In addition, Stoner refused to attend any of the Board of Directors meetings for the first year and a half after the acquisition.

In mid–1960, Rod Phillips and his son Bill, both of whom had previously worked for Stoner Manufacturing, resigned as engineers for Vendo and solicited Stoner's financial support. Phillips requested Stoner's assistance in covering the development of the Lektro–Vend vending machine.

Stoner provided the Phillips' with interest–free loans, which aggregated some $200,000.00, during 1961 and 1962. In 1961, when two more Vendo employees (and former Stoner Manufacturing employees) resigned, they joined Rod and Bill Phillips on the research and development project and received monthly salaries aggregating $1,150.00 from Stoner Investments.

Lektro–Vend was responsible for developing the Lektro–Vend FIFO machine. By October, 1962, the development work on this machine had progressed far enough to enable the company to exhibit a prototype of the machine at a trade show. The reaction from the industry was favorable.

At the time of its development, the Lektro–Vend FIFO machine had three distinct advantages over other vending machines. The first of these advantages was that the FIFO machine could sell candy bars in the same order in which it had been stocked. The FIFO design produced savings to the operator by reducing the risk of having to vend or discard stale items. It also reduced the frequency of service calls to restock the machine.

The second advantage of the model was that it permitted a continuous visible display of the item which was to be vended next. Thirdly, the Lektro–Vend model employed a type of construction which permitted more than one type of product to be stocked on a single conveyor, thus eliminating the need to exhaust one product line before replacing it with a second. While each of these features had been in existence for some years, Lektro–Vend was the first to combine all of them in a single machine having a practical design.

In 1971, Lektro–Vend began manufacturing a freeze–dried coffee vending machine and, since 1976, has manufactured a glass–front, general merchandising vending machine.

Lektro–Vend's sales and net income after taxes for the fiscal years ending July 31, 1965 through 1977 are set out in the following table:

| Fiscal Year Ending July 31 | Sales | Net Income (Loss) After Taxes |
|---|---|---|
| 1965 | 531,000 | ($120,000) |
| 1966 | 815,000 | ( 85,000) |
| 1967 | 980,000 | ( 119,000) |
| 1968 | 1,361,000 | ( 259,000) |
| 1969 | 2,040,000 | 401,000 |
| 1970 | 1,968,000 | 97,000 |
| 1971 | 1,779,000 | 47,000 |
| 1972 | 2,767,000 | 67,000 |
| 1973 | 2,463,000 | ( 201,000) |
| 1974 | 2,841,000 | ( 169,000) |
| 1975 | 1,846,000 | ( 360,000) |
| 1976 | 1,775,000 | ( 393,000) |
| 1977 | 2,885,000 | ( 129,600) |

In December, 1962, Stoner asked Elmer Pierson, Vendo's Chairman of the Board, to be released from his employment contract, stating that he had an opportunity to invest in the manufacture and sale of the Lektro–Vend machine.

Vendo refused to release Stoner, but asked Stoner to negotiate on Vendo's behalf with the Phillips' to determine whether they had any interest in selling the Lektro–Vend machine.

Stoner wrote to one of Vendo's Vice Presidents, Spencer Childers, stating that the Phillips would be willing to sell the machine for $1,500,000.00, since another company had offered that amount. In March, 1963, Stoner informed Vendo that he had told the Phillips that Vendo no longer had an interest in making the purchase. Childers wrote back stating that Vendo still had such an interest, but that the asking price was too high. Vendo stated that it would be willing to pay a price sufficient to cover development costs and to return a fair profit.

In the summer of 1963, after Pierson's inquiry, Stoner disclosed to Vendo that he had been loaning money to the Phillips, which loans had been paid back by Stoner's sister–in–law.

It appears, however, that Vendo had heard rumors of Stoner's involvement with Lektro–Vend as early as the 1962 trade show. Elmer Pierson stated that Vendo executives and customers of Stoner had stated that Stoner "was bringing out the superlative in fine candy vending equipment" and that Stoner "apparently had a great interest in the Rod Phillips or the Lektro–Vend Company" and that Stoner "wanted to become more active in Lektro–Vend." Wagstaff testified that Vendo executives Pierson, Childers, and Carbaugh had told him "that Harry Stoner was financing Lektro–Vend to go into competition with Vendo."

In March, 1964, Stoner Investments contracted to sell to Lektro–Vend a new plant built by Stoner Investments. The purchase by Lektro–Vend was made with the proceeds of a bank loan which was advanced subject to an agreement by Stoner Investments to guarantee the repurchase of the property in the event of a default on the loan.

On April 1, 1964, Stoner ceased being a director of Vendo and was not slated for re–election.

On June 1, 1964, Stoner's employment contract with Vendo expired and the contract was not renewed.

On June 10, 1964, Lektro–Vend issued 5,000 shares of its stock to Mrs. Stoner, and on July 15, 1964 it issued 5,000 shares of its stock to Stoner Investments.

In March, 1965, Stoner sent a letter to 50 vending machine operators in which he identified himself as the long time former president of the old Stoner Manufacturing Corp. and stated that he was now interested in Lektro–Vend. Stoner sent a copy of this letter to Pierson, who, in turn, forwarded it to Vendo's general counsel Glenn Carbaugh with the notation that Stoner had gone "too far."

## HISTORY OF THE PRIOR LITIGATION

In August, 1965, Vendo, defendant herein, filed suit against Harry Stoner and Stoner Investments, plaintiffs herein, in Kane County, Illinois, charging them with breaching non–competition covenants and with theft of trade secrets. After a bench trial, the court found in favor of Vendo on December 16, 1966 and entered judgments against Harry Stoner in the amount of $250,000.00 and against both Harry Stoner

and Stoner Investments in the amount of $1,100,000.00. Additionally, the court enjoined Stoner and Stoner Investments from further acts of competition.

On January 30, 1969, the Illinois Appellate Court for the Second District held that no trade secrets were involved; that the non–competition covenants were valid and enforceable; that defendants, Stoner and Stoner Investments had breached those covenants; and, that the grant of injunctive relief was proper. *Vendo Company v. Stoner*, 105 Ill.App.2d 261, 245 N.E.2d 263 (2nd Dist. 1969). Additionally, the Court held that the trial court had erred in striking the affirmative defense based on the federal anti–trust laws but was correct in denying the defense based on the Illinois anti–trust laws. The case was remanded for a determination of damages and further proceedings.

Upon remand, the defendants withdrew the affirmative defense based on the federal anti–trust laws. Thereafter, the trial court entered judgments totalling $7,363,-500.00 against Stoner and Stoner Investments.

A second appeal followed in which the Appellate Court held that the trial court erred in the measurement of damages. The case was again remanded for assessment of damages in accordance with the Appellate Court's original opinion. *Vendo v. Stoner*, 13 Ill.App.3d 291, 300 N.E.2d 632 (2nd Dist. 1973).

On appeal to the Illinois Supreme Court, the Appellate Court was reversed and the trial court judgments were affirmed. However, in deciding the case, the Supreme Court found the judgments proper under a different theory. The Court held that Stoner had breached his fiduciary duties to Vendo and found the $7,363,500.00 in damages appropriate for this breach. *Vendo Co. v. Stoner*, 58 Ill.2d 289, 321 N.E.2d 1 (1974).

In 1965, the instant action was filed by Stoner, Stoner Investments, and Lektro–Vend in the federal district court, alleging various federal anti–trust violations by Vendo. The case lay dormant until 1975 pending a resolution of the state court litigation.

In January, 1975, Vendo received from Chicago Title and Trust Company $582,-526.09, which was held under an escrow trust agreement and which Vendo applied toward Stoner's payment of the state court judgments in favor of Vendo.

On June 27, 1975, the federal district court granted plaintiffs' motion for a preliminary injunction staying defendant's efforts to collect its state court judgments until the merits of the federal suit could be determined. *Lektro–Vend v. Vendo Co.*, 403 F.Supp. 527 (N.D.Ill.1975). On appeal, the Seventh Circuit affirmed the district court's order granting a preliminary injunction. *Lektro–Vend Corp. v. Vendo Co.*, 545 F.2d 1050 (7th Cir. 1976).

On June 29, 1977, the Supreme Court reversed the Seventh Circuit's affirmance of the district court's order remanding the cause to the Seventh Circuit for further proceedings in conformity with their opinion. *Vendo Co. v. Lektro–Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977). On August 19, 1977, the Court of Appeals remanded the case to the district court "for further proceedings in conformity with the opinion of the United States Supreme Court rendered on June 29, 1977."

A petition for rehearing was timely filed in the Supreme Court and denied on October 3, 1977. Nevertheless, on August 29, 1977, Stoner Investments filed proceedings under Chapter XI of the Bankruptcy Act, and an automatic stay was entered, enjoining Vendo and other creditors from enforcing their claims against Stoner Investments.

Meanwhile, plaintiff's herein advanced the position in the district court that the injunction which it had issued continued to be binding in spite of the Supreme Court's opinion of June 29, 1977. Consequently, Vendo filed a motion in the district court asking that the preliminary injunction previously issued be formally dissolved. The district court refused to dissolve the injunction and stated that, if Vendo attempted to

collect its state court judgments, it would be risking contempt proceedings.

Thereafter, petitioner filed a motion for clarification in the Supreme Court, which that Court treated as a petition requesting the Supreme Court to mandamus the district court to dissolve the injunction. The Supreme Court held that the motion for clarification, actually being a motion for mandamus, did not comply with rules regarding a writ of mandamus and, accordingly, denied the petition for clarification of judgment without prejudice to the filing of a motion for leave to file a petition for mandamus. *Vendo Company v. Lektro–Vend Corp.*, 434 U.S. 425, 98 S.Ct. 702, 54 L.Ed.2d 659 (1978).

The mandamus petition did not issue, however, since the district court formally dissolved the injunction on April 6, 1978.

Thereafter, Judge Eisen denied Vendo's motion to dismiss the Bankruptcy Proceedings and to vacate the stay issuing from the Bankruptcy Court enjoining Vendo and other creditors from enforcing their claims against Stoner Investments. Vendo has appealed this decision.

### THE PRESENT LITIGATION

The dispute in this case involves the purpose, effect, and legal significance of the acquisition of Stoner Manufacturing and the employment of Stoner by Vendo.

On the one hand, plaintiffs contend that the sale and acquisition of Stoner Manufacturing are not now and never were legally effective because the acquisition agreement, including the employment contract of Stoner, violated the federal anti–trust laws. According to plaintiffs, Vendo's sole purpose in acquiring Stoner Manufacturing was to eliminate Stoner, "the design genius", from competition in the manufacturing and sale of vending machines. This anti–competitive intent, argues plaintiff, is demonstrated by Vendo's exaction of overbroad restrictive covenants which, plaintiff maintains, constitute contracts in restraint of trade in violation of § 1 of The Sherman Act. Additionally, plaintiffs argue that Vendo's anti–competitive purpose is also demonstrated by Vendo relegating Stoner to "senior citizen" status shortly after the acquisition took place; by removing Vendo's Aurora Division, formerly Stoner Manufacturing, from under Stoner's control; by refusing to release Stoner from his employment with Vendo so that he could become actively involved with the Phillips and Lektro–Vend; and by refusing to accept Stoner's advice that Vendo purchase the Lektro–Vend machine.

Plaintiffs also argue that Vendo's knowing exaction of unenforceable and voidable restrictive covenants, and the subsequent enforcement of those covenants in the state court litigation, constitute overt acts in pursuit of Vendo's attempt to monopolize in violation of section 2 of The Sherman Act.

As a third argument, plaintiffs contend that the acquisition constituted a merger which substantially lessened competition in violation of Section 7 of the Clayton Act.

Vendo, on the other hand, maintains first, that the covenants not to compete exacted from Stoner and Stoner Manufacturing do not constitute contracts in restraint of trade in violation of § 1 of The Sherman Act. Vendo argues that these covenants not to compete were not overbroad; were exacted, not to restrain competition, but rather to protect its purchase of Stoner Manufacturing and its employment of Stoner; and, were ancillary to the main sale and employment agreements. It is Vendo's contention that their primary reason for obtaining these covenants was to insure that Stoner did not use Vendo's money and facilities to go into competition with Vendo subsequent to the sale. Additionally, Vendo maintains that no adverse market impact resulted from these covenants. Also, contends Vendo, plaintiffs alleged anti–trust claims are barred by the doctrine of in pari delicto.

Second, Vendo maintains that there is no § 2 Sherman Act violation because there is no evidence that Vendo had the means to monopolize, and because the state court proceedings brought to enforce the non–competition covenants were justified on the

grounds of Stoner's breach of those restrictive covenants or breach of fiduciary duties.

Third, Vendo argues that no § 7 Clayton Act violation exists because the acquisition was a valid product extension merger and had no anti–competitive impact.

After hearing the evidence proffered at trial and reviewing all the materials and information submitted in this case, a summary of this court's view of the events is as follows.

Sometime between 1957 and 1959 after Stoner's first offer to sell Stoner Manufacturing to Vendo, Stoner Manufacturing lost several of its important officers including Adelberg, who had been Stoner's close associate and Executive Vice President. During this same period of time, Stoner's health was failing, Stoner Manufacturing was failing, and the strain on Stoner in running the firm alone caused him to be concerned about the future management of Stoner Manufacturing, and the effect that continued loss of profits would have on its employees and shareholders.

As a result, Stoner considered it advisable to sell Stoner Manufacturing and, consequently, Stoner approached Vendo for a second time as a likely purchaser. Since Vendo was in fact interested at this time in expanding its line of vending machines the parties were able to reach an agreement acceptable to each for the sale and acquisition of Stoner Manufacturing.

Pursuant to the sale agreement, Vendo agreed to pay Stoner $3,400,000.00 in cash and deliver 60,000 shares of Vendo for the purchase of Stoner Manufacturing, including inventions, patents, drawings, designs, and research and development work.

Included in the sale of Stoner Manufacturing were provisions for Vendo to lease the land and property of Stoner Manufacturing in Aurora, Illinois, with an option to buy on or after December 31, 1961.

Additionally, Vendo agreed to pay all profits in excess of $250,000.00 realized from the use of assets being purchased and, for a period of ten years, 25% of the income received from the foreign production of the machines being acquired from Stoner Manufacturing.

In exchange, Stoner Manufacturing was to refrain from competing with Vendo for a period of ten years.

Stoner also entered into an employment agreement with Vendo whereby Vendo would pay Stoner $50,000.00 a year for five years for Stoner's services as an officer of Vendo. Stoner would also serve as a director of Vendo without additional compensation. Additionally, Stoner could regulate his own hours consistent with his health.

In exchange for this employment, Stoner agreed not to compete with Vendo for a period of ten years.

Originally, these restrictive covenants were to run for a period of five years, but, because Stoner wanted a ten year payout, the restrictions were increased to cover the same ten year period.

Shortly after the consummation of the sale, Stoner became dissatisfied with the arrangement apparently because he felt that Vendo was ignoring his advice and counsel and relegating him to "senior citizen status." In addition, Vendo moved a large part of the Stoner Manufacturing operation, Vendo's Aurora Division, to St. Louis contrary to Stoner's expectations when he entered into the agreements.

Several of Stoner's former employees stayed behind, declining to make the transfer to St. Louis. Two or these employees, Rod and Bill Phillips, approached Stoner and successfully obtained his assistance in establishing Lektro–Vend, a new vending manufacturing company, which eventually produced a successful FIFO machine. Stoner gave, at the least, financial support and the property on which to establish the plant and took a large financial stake in Lektro–Vend. By late 1962, after the successful exhibition of the Lektro–Vend machine, Stoner advised his former customers that he had gone into business with Lektro–Vend and asked to be released from his employment contract with Vendo in order to pursue his investment in Lektro–Vend. Vendo refused.

In 1965, after the expiration of Stoner's employment with Vendo, Vendo filed suit in state court alleging that Stoner breached the restrictive covenants contained in both the sale and employment agreements. Vendo obtained judgments throughout the lower courts in its favor on the ground that Stoner had breached the restrictive covenants. Eventually, the Illinois Supreme Court upheld the judgments in the total amount of $7,363,500.00 in Vendo's favor but on the grounds that Stoner had breached his fiduciary duties as an officer and director of Vendo.

While not a party to these state court actions, one of the plaintiffs here, Lektro–Vend, alleges it suffered in its business venture as a result of the state court judgments obtained against Stoner Investments, Lektro–Vend's primary source of financial support. It is this alleged loss of sales and business that plaintiffs maintain constitute an injury cognizable under the federal anti–trust laws.

## CONCLUSIONS OF LAW [6]

It is agreed that the jurisdiction of this court is founded on the Sherman and Clayton Acts, 15 U.S.C. §§ 1, 2, 4, 7, 15, 16, 18, and 26.

The parties have agreed that the legal standard to be applied is one of federal law. See also, *Schine Chain Theatres v. U. S.,* 334 U. S. 110, 119, 68 S.Ct. 947, 952, 92 L.Ed. 1245 (1948).

First, before reaching the substantive anti–trust allegations, this court will consider the affirmative defenses raised by defendants.

Contrary to defendant's contentions, the doctrine of collateral estoppel does not bar this court from deciding factual issues de novo in the instant case as they relate to the anti–trust issues here presented. Defendants here contend that under the doctrine of collateral estoppel, this court is bound by the findings of fact of the state courts. In analyzing whether this court is collaterally estopped by a prior judgment or determination, four questions must be answered in the affirmative to support the application of that doctrine: 1) whether the issues sought to be concluded are the same as those involved in the prior action; 2) whether the issues involved were in fact litigated in the prior actions; 3) whether the issues involved were in fact judicially determined in the prior action; and 4) whether the judgment in the prior action was dependent upon the determination made of those issues. See, Moore's Federal Practice, Vol. 1B ¶ 0.443[1] p. 3902. In the instant case, it is clear that none of these questions may be answered in the affirmative. This is confirmed by the Illinois Supreme Court's statement in *Vendo v. Stoner,* 58 Ill.2d 289, 321 N.E.2d 1, 12 (1974):

At the original trial defendants [plaintiffs here] raised an affirmative defense and by way of counterclaim a charge that the sale agreement and the employment contract violated both the Illinois Antitrust Act (Ill.Rev.Stat. ch. 38, par. 60–1 et. seq. [1973]) and the Federal anti–trust laws (15 U.S.C. § 1 et. seq.). The latter charge was withdrawn by defendants on the remand, and references in the record indicate that at some point a suit was filed against plaintiff in the United States District Court for the Northern District of Illinois relating to the alleged violations of federal law.

With respect to the state antitrust claim the appellate court on the first appeal affirmed the action of the trial court in striking the affirmative defense and counterclaim. On the remand defendants unsuccessfully sought to reinstate their defenses and counterclaim, and the appellate court again affirmed the judgment of the trial court in this respect. By leave of court the State of Illinois has filed a brief supporting defendants' position on this issue.

---

**6.** Any conclusion of law which may be more properly termed a finding of fact shall be deemed a finding of fact.

There is some dispute between the parties as to whether the first opinion of the appellate court was based on the theory that the Illinois act was preempted by the Federal antitrust laws or upon the inapplicability of the Illinois act because of the absence of a substantial impact in Illinois arising out of the acts complained of.

We prefer to dispose of this issue on another ground, namely that the Illinois act, having been enacted in 1965, long after the contracts here in question were entered into, cannot properly form the basis of a counterclaim by defendants.

From this passage, it is clear that the state court gave no consideration to the federal anti–trust claims presented here. Consequently, this court is not bound by the findings of fact made in the state courts, and must therefore determine the facts as they relate to the alleged anti–trust claims.

Moreover, we note that there is authority for the broad proposition that "the grant to the district courts of exclusive jurisdiction over the action for treble damages should be taken to imply immunity of their decision from any prejudgment elsewhere." *Lyons v. Westinghouse*, 222 F.2d 184, 189 (2d Cir. 1955) *cert. denied* 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737; *Mach–Tronics, Inc. v. Zipoli*, 316 F.2d 820 (9th Cir. 1963).

As a practical matter, however, this court notes that our findings of facts, which overlap the findings made in the state courts, do not differ substantially from the findings previously made.

■ Defendant also contends that plaintiffs, Stoner and Stoner Investments, are barred from seeking damages under the doctrine of in pari delicto. It is defendant's claim that, since Stoner and Stoner Manufacturing were willing, knowledgeable participants and represented by counsel in negotiating the 1959 agreements, they must, as a consequence, be held equally responsible for the final terms of those agreements, and, therefore, be barred from challenging any aspect of these agreements under the anti–trust laws.

This court cannot say, however, that the instant facts support the application of the in pari delicto defense. In *Perma–Life Mufflers, Inc. v. International Paper Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Supreme Court held that the doctrine of in pari delicto was not a defense to an anti–trust action. Although the *Perma–Life* Court noted that there may possibly be exceptions to this general rule, the record in the instant case does not support defendant's contention that the facts in the instant case fall within the exceptions delineated in *Perma–Life*. There is no evidence in the record, for instance, that plaintiffs actively or actually favored or supported the ten year restrictive covenants that became the terms of the final agreements. On the contrary, here, as in the *Perma–Life* case, these clauses "were quite clearly detrimental to their interests, and they alleged that they had continually objected to them." 392 U.S. at 139, 88 S.Ct. at 1985. This record does not support the conclusion that plaintiffs were "collaborator(s), or co-adventurer(s), or true particeps criminis" with respect to the restrictive covenants which now form the basis of the present complaint. Consequently, defendant's in pari delicto defense must be rejected.

■■ Defendants next contend that the claims here are barred by the four year statute of limitations under § 4B of the Clayton Act. 15 U.S.C. § 15b. However, it is well settled that the period of this statute of limitations commences to run from the last overt act of the alleged conspiracy. *Zenith Radio Corporation v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1970); *Weber v. Consumers Digest, Inc.*, 440 F.2d 729, 731 (7th Cir. 1971). Thus, while the execution of the 1959 agreements, which forms the basis of plaintiff's claims, fall outside of the applicable time period, the filing of the state court suits in 1965 constitutes the last alleged overt act committed pursuant to the conspiracy charged, and, consequently, the filing of this action in 1965 was well within the four year statute of limitations period.

Moreover, it has been held that under § 4B the statute begins to run at the time the plaintiff suffers injury and not necessarily at the time the merger is consummated. See, *Metropolitan Liquor Co, Inc. v. Heublein, Inc.*, CCH 1970 Trade Cases ¶ 72,990 (Wisc.1969). In the instant case, the alleged anti–trust injury suffered by plaintiff was the collection of the state court judgments which did not occur until 1974 when the Illinois Supreme Court upheld the damages award. Consequently, the instant action is not barred under § 4B of the Clayton Act.

We turn now to a consideration of the substantive anti–trust claims. First, this court must determine the relevant geographic and product markets, a determination necessary for purposes of analyzing both the Sherman Act and the Clayton Act claims. See, e. g. *U. S. v. E. I. duPont de Nemours and Co.*, 351 U.S. 377, 394, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956); *U. S. v. E. I. duPont de Nemours and Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957); and *Brown Shoe Co. v. U. S.*, 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

For purposes of defining a relevant product market, or "line of commerce," under §§ 1 and 2 of the Sherman Act and under § 7 of the Clayton Act, Department of Justice Guidelines provide the following criteria:

> The sales of any product or service which is distinguishable as a matter of commercial practice from other products or services will ordinarily constitute a relevant product market, even though, from the standpoint of most purchasers, other products may be reasonably, but not perfectly, interchangeable with it in terms of price, quality, and use. On the other hand, the sales of two distinct products to a particular group of purchasers can also appropriately be grouped into a single market where the two products are reasonably interchangeable for that group in terms of price, quality, and use. In this latter case, however, it may be necessary also to include in the market the sales of one or more other products which are equally interchangeable with the two products in terms of price, quality, and use from the standpoint of that group of purchasers for whom the two products are interchangeable.

Trade Reg.Rep. ¶ 4430, par. 3(i) at 6682. In *Brown Shoe Co., Inc. v. U. S.*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), the Supreme Court set forth the critical elements to be considered in determining valid product markets and potential submarkets:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross–elasticity of demand between the product itself and substitutes for it. However, within this broad market, well–defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E. I. duPont de Nemours & Co.*, 353 U.S. 586, 593–595, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

See also, *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 399, 76 S.Ct. 994, 1001, 100 L.Ed. 1264 (1956); *Sargent–Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir. 1977), *cert. denied* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); and *Bendix Corporation v. Balax, Inc.*, 471 F.2d 149, 161 (7th Cir. 1972) *cert. denied* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973).

Recently, in *Sargent–Welch, supra,* the Seventh Circuit noted that:

> The most important of these factors is uniqueness of the product's functions and therefore its uses. If two products are 'reasonably interchangeable by consumers for the same purposes,' they are considered to be in the same market. [Citations omitted]. We have said on two

relatively recent occasions, however, that a market definition 'which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful.' *Cass Student Advertising, Inc. v. National Education Advertising Service, Inc.*, 516 F.2d 1092, 1095 (7th Cir. 1975), cert. denied 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303, quoting from *L. G. Balfour Co. v. FTC*, 442 F.2d 1, 11 (7th Cir. 1971), which in turn quotes from *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 592 (S.D.N.Y.1958).

567 F.2d at 710.

Plaintiffs, relying on *Seeburg Corporation v. Federal Trade Commission*, 425 F.2d 124, 126 (6th Cir. 1970), cert. denied, 400 U.S. 866, 91 S.Ct. 104, 27 L.Ed.2d 105 (1970), argue that the relevant product market includes coin operated vending machines for food, beverages, and tobacco products. In support of this proposed market, plaintiffs contend that the "location is the market," because all vending machines compete for space at vending machine locations and therefore, have a similarity of use. Additionally, plaintiffs assert that there is a similarity in the channels of distribution employed by manufacturers within this market; that there is a similarity as to product characteristics and as to methods of production of vending machines; and that all vending machines sell products which satisfy refreshment needs of consumers at vending locations.

Defendant, on the other hand, argues that plaintiffs' proposed definition of the market is unsupportable because it ignores the fundamental distinction between two basic classes of customers for vending machines, which, defendant argues, properly characterizes the competitive realities of the market place and accordingly meets the applicable legal standards laid down by the Supreme Court in *duPont* and *Brown Shoe*, *supra*. Defendant would define the product market according to two classes of customers for vending machine manufacturers: soft drink bottlers (e. g., the Coca–Cola bottling companies), which only purchase machines that vend soft drinks, and vending service companies, customarily referred to in the trade as "operators", which purchase vending machines for the sale of food, beverages, and other items typically manufactured by others, including vending machines for hot, cold, and frozen foods, dairy products, coffee, candy, pastry, snacks, ice, soft drinks, and cigarettes.

■ Despite defendant's contention to the contrary, this court does not perceive a significant dispute between the parties as to the appropriate product market for purposes of this case. Whether we view the overall product market from the standpoint of the "location" as plaintiff suggests, or from the standpoint of the customers served as defendant suggests, the product market in the instant case consists of all coin–operated vending machines for the sale of food, beverages, and cigarettes, including vending machines for hot, cold, and frozen foods, dairy products, coffee, candy, pastry, snacks, ice, soft drinks, and cigarettes. It is clear to this court that whether we focus on the two different customers for vending machines, bottlers and operators, as defendant argues, or the location as plaintiffs argue, the reasonable interchangeability of use or cross–elasticity of demand between the product itself and substitutes for it are the same whether the manufacturer is selling to different operator customers (as opposed to bottlers) or is competing for space at locations for vending machines.

The parties agree that the geographic market encompasses the entire United States.

As the following analysis demonstrates, this court must conclude that the requisite anti–trust injury has not been demonstrated by plaintiffs and that no anti–trust violations have been shown.

In essence, plaintiffs claim of antitrust injury is as follows. In 1965, Lektro–Vend possessed the probable ability to manufacture vending machines which would be superior to other competitive equipment. However, argues plaintiff, Lektro–Vend's potential was nipped in the bud when Vendo successfully obtained judgments in the

state courts against Stoner and Stoner Investments, Lektro–Vend's chief source of financial support. Because Lektro–Vend was rendered unable to effectively compete as a consequence of these judgments, Vendo is guilty of anti–competitive conduct. In other words, if Vendo had not acquired Stoner Manufacturing and employed Stoner; if Vendo had not exacted non–competition covenants from both Stoner and Stoner Manufacturing; and, if Vendo had not enforced those covenants against Stoner and Stoner Manufacturing, then Lektro–Vend would have become a significant competitor in the vending machine industry. Consequently, maintains plaintiff, Vendo's acquisition of Stoner Manufacturing and employment of Stoner, including the exaction and enforcement of allegedly overbroad non–competition covenants, must violate the anti–trust laws due to the later effect on Lektro–Vend.

To accept plaintiffs' characterization of this situation would put the cart before the horse and would in this court's opinion not only result in a misapplication of the anti–trust laws, but more significantly would seriously undermine the law of contracts.

■ As will be shown, plaintiffs offered little evidence to show that the terms and conditions of Vendo's acquisition of Stoner Manufacturing and employment of Stoner violated the anti–trust laws. The mere fact that Lektro–Vend, a company whose existence was made possible only by this acquisition and employment transaction and the monies Stoner received therefrom, suffered economically when these transactions broke down cannot alone establish violation of the anti–trust laws.

On the contrary, this court views the relevancy of Lektro–Vend's existence, if any, as merely substantiating Vendo's decision to include non–competition covenants in Stoner's employment contract and the sale contract because of its concern, at the time Stoner Manufacturing was acquired, that Stoner would use the money obtained from Vendo to attempt to compete with it.

■ First, this court concludes that plaintiffs' contention that the covenants not to compete violate § 1 of the Sherman Act cannot be substantiated by the record.

Section 1 of the Sherman Act prohibits:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations
. . . .

15 U.S.C. § 1.

Plaintiff contends that the covenants were overbroad and that their purpose and effect were primarily directed toward the elimination of Stoner as a competitor. This court disagrees.

■ It has long been established that the Sherman Act, apart from certain *per se* offenses, only prohibits those contracts and combinations which "unreasonably" restrain trade when analyzed in their business and economic context. *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). It has also been uniformly recognized that non–competition covenants ancillary to the sale of a business or contained in employment contracts are subject to this Rule of Reason and are not *per se* illegal. E. g., *Snap–On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963); *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658, 666 (2nd Cir. 1974); *United States v. Empire Gas Corp.*, 537 F.2d 296, 307 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). See also *National Society of Professional Engineers v. United States*, 435 U.S. 679, 689, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978) (per Stevens, J.), specifically reaffirming the Rule of Reason "as a standard for testing enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction, such as an employment contract or the sale of a going business"; and Bork, *Ancillary Restraints and the Sherman Act*, 15 ABA Antitrust Section Proceedings 211, 212 (1959) ("The ancillary restraint is . . . tested in the same manner as all other non–*per se* restraints. The function of ancillarity, then, is to remove the *per se* label from restraints otherwise falling within that category.").

■ Under federal law, a non–competition covenant is legal under two conditions:

"(1) the covenant is merely ancillary to the main purpose of a lawful contract;

(2) the covenant is necessary to protect the legitimate property interests purchased by the covenantee. See *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898), *aff'd as modified*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. Moreover, a covenant not to compete examined in light of other monopolistic practices can be declared illegal even if otherwise lawful if it can be shown that the object and the effect of the agreement was primarily directed at the elimination of competition.

*Schine Chain Theatres v. United States, supra; Bowl America, Inc. v. Fair Lane, Inc.*, 299 F.Supp. 1080 (D.Md.1969)." 403 F.Supp. 527, 532–3. (App. 1, 532–3).

■ In considering the restrictive, non–competition covenants in the instant case in light of the Rule of Reason test, it is this court's duty as fact finder to weigh "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Of primary importance is the "market impact" of the alleged restraint (*Id.* at 50, 97 S.Ct. at 2557) and "the challenged restraint's impact on competitive conditions" (*National Society of Professional Engineers, supra*, 98 S.Ct. at 1363).

In this vein, this court finds it noteworthy that there appears to be an absence of even a single decision condemning under the antitrust laws the kind of covenant involved in this case. *Bradford v. New York Times Co.*, 501 F.2d 51 (2d Cir. 1974), is very much in point. There, the Second Circuit rejected an antitrust attack on a post–term employment contract broadly providing that

. . . during the period that payments are made to me under the [Incentive Compensation] Plan and in consideration of such payments I will not engage in any business or practice or become employed in any position in competition with The Times or which is otherwise prejudicial to the interests of The Times and that I will hold myself available to The Times for reasonable consultation and other services.

501 F.2d at 54.

The Court emphasized the distinction "between, on the one hand, a covenant barring an employee or partner from competing while he is employed or engaged in the business of the partnership . . . and covenants by the seller of a business and its good will to refrain from competing with the buyer . . . and, on the other hand, covenants which bar an employee from competing after he has severed his relationship with his employer. . . ." The Court then held:

There is more flexibility in the first two categories in determining whether or not the covenant is reasonable because the employee or seller is receiving some consideration for the covenant–his salary is being paid or he has received consideration for the sale of the good will. The employee in the last category, however, may become a public charge, and, in any event, it is distasteful to curtail his opportunity to make a living. *The case before us presents no such elements of unfairness. . . .* There was a continuing consideration being paid for his loyalty and good will. While this was a restraint upon his liberty, it can hardly be described as unreasonable. (Emphasis added).

501 F.2d at 58. See also *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1083 (2nd Cir. 1977) ("Nor did Gross show anticompetitive impact, industrial practice, etc. such as might conceivably warrant a finding that the scope of the restriction enforced was unreasonable").

In *United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir. 1976), the defendant (which had approximately 50% of the market) had obtained 3,239 non–competition covenants signed by its employees, and had also entered into 81 different acquisition agreements containing non–competition

covenants. In rejecting the Government's attack on these covenants as allegedly constituting an unreasonable restraint of trade, the Eighth Circuit stated that "Covenants of these two types have not generally been considered violative of the antitrust laws" and "Covenants not to compete executed in conjunction with the purchase of a business allow the purchaser to obtain the value of the good will for which he had paid." The Court held:

> The difficulty with the Government's position is that there is no showing that any restraint was unreasonable so as to violate the Sherman Act. Counsel for the United States apparently believes that the burden is on Empire to establish the reasonableness of each of the more than 3,000 contracts with their varying terms. However, the burden of showing unreasonableness of a restraint of trade, except where there is a *per se* violation of the Act, is on the plaintiff. . . . In addition, the record is barren as to the actual effect of these covenants on competition in the LP retail market. . . . We agree with the district court's conclusion that the mere existence of a large number of covenants not to compete does not establish a 15 U.S.C. § 1 violation. (Citations omitted).

537 F.2d at 308. See also *Goldberg v. Tri-States Theatre Corp.*, 126 F.2d 20, 30–32 (8th Cir. 1942).

If anything, the law of the Seventh Circuit is even more favorable to the antitrust validity of non–competition covenants. See, e. g., *Harrison v. Glucose Sugar Refining Co.*, 116 F. 304 (7th Cir. 1902); *Snap–On Tools Corp. v. FTC*, 321 F.2d 825, 837 (7th Cir. 1963).

At issue in *Harrison* was the validity of a covenant by an employee, in a contract by which he was employed for five years, that he would not during such term compete with his employer at any place within a radius of 1,500 miles from the employer's principal place of business. The Seventh Circuit held that this covenant was not against public policy and was not void as in restraint of trade:

> The doctrine of restraint of trade had its birth in conditions anciently obtaining, and now greatly changed. Then the area of trade was confined within narrow territorial bounds. Intercommunication has become largely extended, and trades anciently limited to a small locality have become national in their extent. The rule is bottomed upon the consideration whether such a covenant was broader than the covenantee required for his protection.

> \* \* \* \* \* \*

> Notwithstanding some authorities which seem to have followed blindly the ancient rule, overlooking the reason of the rule and the changed conditions, it is not just to limit the territory within which restraint may be applied by any arbitrary geographical bounds, without regard to the nature and extent of the business in which the restraint is sought to be imposed.

> \* \* \* \* \* \*

> Clearly, under such circumstances no public policy would be violated in upholding the covenants. He is not deprived of the opportunity to obtain the means of subsistence or of giving to the public the benefit of his skill in the business to which he has been accustomed. He has only to perform the duty which he engaged to perform to render himself and his family comfortable. We know of no public policy which requires us to sanction the bald violation of a contract lest the public should be deprived of the peculiar skill of the appellant because he will not exercise that skill where he has engaged to exercise it.

116 F. at 308–310.

Similarly, in the *Snap–On Tools* case, *supra*, 321 F.2d at 837, the Seventh Circuit sustained challenged post–term covenants even under § 5 of the FTC Act (a more restrictive provision than the Sherman Act), on the ground that the FTC had failed to develop facts in the record showing any substantial restraint of trade.

■ In the instant case, this court concludes that the non–competition covenants exacted from Stoner and Stoner Manufacturing were ancillary to the main purpose of lawful contracts. From the view of both plaintiff and defendant, the sale and acquisition of Stoner Manufacturing was clearly the purpose behind the execution of the agreements. In fact, this court finds plaintiffs' contention that the main purpose of the sale and acquisition was to eliminate Stoner from competition to be incredible, particularly in view of the fact that it was Stoner who first approached Vendo concerning Vendo's possible purchase of Stoner Manufacturing and it was Stoner who sought the ten year as opposed to five year payout, which resulted in the terms of the covenants being increased from five to ten years.

Moreover, based on the fact that Stoner became involved with Lektro–Vend within a year or two after selling Stoner Manufacturing, and considering the substantial financial commitment of Vendo in purchasing Stoner Manufacturing, it appears to this court that the restrictive covenants in the instant case were clearly necessary to protect Vendo's interests in the acquired business and employment of Stoner.

Additionally, plaintiffs' contention that the restrictive non–competition covenants are overbroad is without merit under the circumstances of this case.

Before the 1959 acquisition, it is indisputable that Stoner Manufacturing as well as Vendo operated throughout the United States and abroad and that Stoner Manufacturing's contract provided for additional payments from Vendo based on world–wide sales. Nevertheless, in addition to the preposterous contention that Vendo's real purpose for the 1959 acquisition was to obtain the covenants, plaintiffs argue that the covenants were illegal (a) because they were "couched in terms of prohibiting competition wherever the acquiring company (Vendo) was operating or intended to operate" rather than being phrased in terms of Stoner's operations, and (b) because they applied to "all products Vendo manufactured and sold" rather than just those manufactured by Stoner.

Even apart from the fact that we are dealing with "in–term" and not post–term covenants, there is not the slightest basis for holding the covenants illegal on either of the suggested grounds.

It should be emphasized that Stoner's misconduct did not relate to some foreign land or some product far removed from Stoner's prior operations. On the contrary, the secret development of the Lektro–Vend machine took place right in Aurora, Illinois, and the Lektro–Vend machine was also a candy–vending machine.

Also, Stoner's misconduct took place not long after the execution of the 1959 agreements. In these circumstances, there was no attempt whatever to enforce the covenants as to any place or any product which the plaintiffs could conceivably claim was "over broad". Vendo's state court suit and the judgments it obtained were based only on activities of Stoner in the United States and on Vendo's loss of its U. S. market share with respect to candy machines. That being so, plaintiffs' objection to the phrasing of the covenants is irrelevant. See, e. g., *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1082–83 (2nd Cir. 1977), cited by the plaintiffs: "Thus, Gross has not proved that the Partnership knowingly enforced the arguably overbroad portion of the non–competition clause."

Additionally, there is authority for the position that, irrespective of the language used in a non–competition covenant, if the violation takes place within the area in which the restraining covenant would be reasonable, the covenant should be enforced limited to the area in which the restraint is reasonable. J. D. Calamari & J. M. Perillo, The Law of Contracts (1st Ed. 1970).

■ While it might be argued that the ten year restrictive covenants in this case are overbroad, that is not the essential inquiry here. Of primary importance is the "market impact" of the alleged restraint (*GTE Sylvania, supra*, 433 U.S. at 50, 97 S.Ct. at 2557), and "the challenged re-

straint's impact on competitive conditions" (*National Society of Professional Engineers, supra*, 435 U.S. 688, 98 S.Ct. 1363). The way in which a covenant is *phrased* tells nothing about its "market impact". And, unless there is a significant adverse "market impact", the covenant does not violate the Sherman Act. In *Northwest Power*, the Court specifically stated that "[t]o prove an antitrust violation under the rule of reason, [plaintiff] must show the defendants' conduct *adversely affected competition.*" *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 1978–2 Trade Cases ¶ 62,142 (5th Cir.) at p. 75,042. (Emphasis added). "Absent anti–competitive effect, an unlawful intent will not establish a rule of reason violation ... nor will the use of unfair methods of competition." *H & B Equipment Co. v. International Harvester Co.*, 1978–2 Trade Cases ¶ 62,136 (5th Cir. at p. 75,012).

 Plaintiffs have failed to carry their burden of establishing an adverse "market impact" that would render these covenants unreasonable under the Rule of Reason and, therefore, violative of § 1 of the Sherman Act. E. g., *United States v. Empire Gas Co.*, 537 F.2d 296, 307–08 (8th Cir. 1976); *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1082–83 (2d Cir. 1977).

As the following discussion makes clear, plaintiffs have not, nor could they in this court's opinion, establish that the five year restrictions, the enforcement of which were limited to the Aurora, Illinois area, adversely affected the market or competition so as to render these covenants unreasonable and violative of the anti–trust laws.

Finally, this court concludes that neither plaintiffs' § 2 Sherman Act claim nor its § 7 Clayton Act claim is supported by the record so that these otherwise lawful restrictive covenants are rendered unlawful by these other alleged monopolistic practices.

Section 2 of the Sherman Act provides in pertinent part that:

> Every person who shall monopolize, or attempt to monopolize, ... any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor ....

 In order to prove an attempt to monopolize, the plaintiff must establish: (1) the relevant market in which the attempt allegedly took place; (2) a dangerous probability that the defendant would have achieved monopoly power in that market; and (3) the defendant's specific intent to achieve such monopoly power. See, e. g., *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177–78, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 295–97 (7th Cir. 1974).

Plaintiffs do not contend that Vendo ever had a monopoly–an initial prerequisite to "monopolization" under Section 2 of the Sherman Act. Instead, plaintiffs charge that Vendo has *attempted* to monopolize the manufacture of "coin operated food and beverage vending machines" in violation of Section 2.

 However, as the Supreme Court pointed out in *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946), the offense of attempt to monopolize requires proof of "the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it ...."

 Plaintiffs have failed to prove the requisite elements of a Section 2 offense for the following reasons.

In arguing that Vendo had the requisite power to support a finding of dangerous probability, plaintiffs offer bare statistics as to Vendo's size, market share, sales, and profits and then sweepingly conclude that "[t]he evidence in this record has sufficient specificity as to relevant market, total market and market shares to satisfy any standards that may be required under the reported cases." However, plaintiffs not only misconceive the applicable legal standard, but, in addition, an analysis of Vendo's business refutes any notion of a dangerous probability of achieving monopoly power.

Although not dispositive of the instant case, Vendo's business subsequent to the purchase of Stoner Manufacturing is worth noting.

Plaintiffs cite the fact that Vendo's sales and profits increased from 1955 to 1966, yet fail to note that between 1960 and 1963, the initial years of the "fabulous 60's", Vendo's sales declined from $61 million to $52 million and its profits fell from $3.1 million to $1.9 million. In 1966, the best year Vendo ever had, its net income as a percentage of sales was only 7%. Since then that figure has averaged only 0.7%, sales have been stagnant (even ignoring inflation), and profits have declined, culminating in significant losses in the last four years totalling nearly ten million dollars.

Vendo's failing health is reflected in its market share statistics as well. In every area of its business, Vendo's share has declined. In operator products, Vendo fell from a high of 22.5% in 1966 to a low of 7.4% in 1974. As the Illinois Supreme Court found in the ten years following the Stoner acquisition, Vendo's share of the candy market was cut in half. 58 Ill.2d at 311, 321 N.E.2d 1. By 1972, Vendo was completely out of the candy and cigarette vending machine business. Under plaintiffs' definition of the relevant market and the figures they have offered, Vendo's share declined from 33% in 1966 to 24% in 1973.

Plaintiffs argue that 1959–66 is "the time period most immediately relevant to this suit." Even if this were correct–and no support is cited for such a contention–the test in an attempt case (as previously indicated) is whether there is dangerous probability that defendant would attain monopoly power. Here, rather than speculating as to what would happen in the future (as most courts must of necessity do in evaluating alleged attempts to monopolize), this court has the benefit of observing what actually happened in the marketplace. Vendo did not achieve a monopoly or come dangerously close.

Furthermore, plaintiffs do not offer one case in which a finding of an attempt to monopolize was based on a market share of

the size attributed to Vendo–even apart from the fact that Vendo's share has been declining. Compare, e. g., *United States v. Empire Gas Corp.*, 537 F.2d 296, 305–07 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 973–75 (8th Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969); *Cal Distributing Co. v. Bay Distributors, Inc.*, 337 F.Supp. 1154, 1159–60 (M.D.Fla. 1971); *Allen Ready Mix Concrete Co. v. John A. Denie's Sons Co.*, 1972 Trade Cases ¶ 73,955 (W.D.Tenn.) at pp. 92,005–07; *SCM Corp. v. Radio Corp. of America*, 318 F.Supp. 433, 472–73 (S.D.N.Y.1970); *Diamond International Corp. v. Walterhoefer*, 289 F.Supp. 550, 578 (D.Md.1968). Indeed, these cases demonstrate that not even a 50% market share is in itself sufficient to establish the requisite dangerous probability.

In *Empire Gas, supra*, the Eighth Circuit held that, "... even if we accept the Government's survey as proof that Empire had 50% of the Lebanon market and 47% of the Wheaton market, that alone is not sufficient to show a dangerous probability of success." 537 F.2d at 305. The Government argued that Empire's large market shares in conjunction with its anticompetitive conduct gave rise to a dangerous probability that it would be able to control prices in the two markets. The Court concluded, however, that there was no proof that the "competitors *in these areas* were susceptible to Empire's intimidation." (*Ibid*, emphasis the Court's.) The Court added:

> There is insufficient proof that the competitors of Empire: (a) raised or fixed prices because of Empire's threats; (b) stopped soliciting Empire customers; or (c) decided not to enter the LP business or decided to leave the business on account of defendant's action.

*Ibid.* Nor was the Court persuaded on the dangerous probability issue by the Government's expert economist who testified at the trial on the issue. The Eighth Circuit summarized its ruling on this issue as follows:

Taking the evidence of dangerous probability of success as a whole, as is proper in an antitrust case . . . we cannot find the requisite proof. The Government established that: (a) Empire had a large share of the market in Lebanon and Wheaton in 1972: about 50%; (b) it has engaged in anticompetitive conduct in various areas, which has not been shown to have been effective in the Lebanon or Wheaton areas; (c) the price of LP in Lebanon may be slightly higher than in some other areas, but the reasons for this are a matter of speculation; (d) the defendant has had a fairly high rate of profit for the past ten years. We cannot conclude from this inconclusive evidence that there is a dangerous probability that the defendant will be able to monopolize the LP gas business or exert control over prices or competition in the Lebanon or the Wheaton market areas.

537 F.2d at 306. See also, e. g., *Diamond International Corp., supra,* similarly holding that even a 51% share was insufficient in the circumstances of that case. 289 F.Supp. at 578.

 Even plaintiffs' economist testified that knowledge of a firm's market share is an insufficient basis for determining that firm's market power. He stated that, besides market share, one needs to know such things as the nature of the products being produced, the ease of entry into the market, and the market shares of other competitors. Plaintiffs offered the court little or no information on competitors' market shares, and their economist made no attempt to gather such information in arriving at his opinions.[7] The evidence with regard to ease of entry contradicts his opinion on market power.

 In *Empire Gas,*[8] *supra,* even concededly predatory conduct plus a 50% mar-

---

7. Mr. Kamien did not know the market shares of other vending machine manufacturers and admitted having made no effort to determine them. Indeed, he testified that he made no empirical studies of the industry and did not contact any operators, location owners, trade associations, trade journals or other vending machine manufacturers.

Not only are his opinions as to Vendo's dominance and monopoly power based on inadequate knowledge of the industry, but they are also based on theories that have no support in the antitrust laws. Contrary to Kamien's opinion that a company wields monopoly power if it merely has the power to *influence* price and *discourage* competition, monopoly power requires the power to *control* prices and *exclude* competition. *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 390–92, 76 S.Ct. 994, 1004 06, 100 L.Ed.2d 1264 (1956); *United States v. Grinnell Corp.,* 384 U.S. 563, 576, 86 S.Ct. 1698, 1706, 16 L.Ed.2d 778 (1966). Following Kamien's own logic, in every market other than that in which there is "perfect competition", there is at least one competitor who has the power to influence price, and thus, according to Kamien's definition of monopoly power, there is at least one competitor who necessarily wields monopoly power. Furthermore, Kamien postulated that if there are five firms in an industry with the power to influence price, each of those five firms would to a certain degree have monopoly power, as he has used the term.

8. The Eighth Circuit stated that "the record before us establishes that the defendant at-

tempted to use price cuts or threats of price cuts to prevent competitors from soliciting Empire customers." 537 F.2d at 302. In addition, the Court concluded that ". . . the evidence establishes that many of the defendant's price cuts were designed to give Empire *control* over the retail *prices* of LP gas." *Ibid.,* emphasis the Court's. The Court also stated that ". . . it seems obvious that the defendant wishes to intimidate its competitors into raising their retail prices to the level that Empire thought would insure it a sufficient profit" and "Liberal price cuts reinforced the message" (*Ibid.*) In this case, by contrast, plaintiffs have not shown any actions of any significance directed toward any of the substantial competitors faced by Vendo.

Plaintiffs also clearly err in asserting that "[n]early any type of activity or practice has been construed as the kind of overt act required to support an attempt to monopolize charge." Indeed, in the absence of monopoly, even statements that claim a right to the market, or statements disparaging competition, are not by themselves evidence of an intent to monopolize. Thus, in *Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269, 285 (8th Cir.), *cert. denied,* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313; 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973), no significance was attached to the statement that the other party "had no right in the walnut shell business. This is my domain." Similarly, in *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir. 1971), the statement by an employee that they would drive plaintiff out of business was not enough

ket share (and over 3,000 non–competition covenants) were found by the Eighth Circuit to be insufficient to establish any real hazard to competition in the relevant market and thus were found to be insufficient to satisfy the dangerous probability test. 537 F.2d at 306–07. See also *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 973–75 (8th Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969) (holding that "loss leader" sales in that case did not give rise to dangerous probability of monopoly).

In this case, the acts claimed by plaintiffs were not predatory and are nowhere near sufficient to create such a danger of monopoly, not only because of Vendo's declining market position, but more significantly because the acts relied upon–Vendo's acquisitions, its alleged policy concerning non–competition covenants, and the state court suit against Stoner and Stoner Investments–have not been directed toward or caused any injury to other companies in the vending machine industry. Plaintiffs do not even contend that Vendo ever sought to injure companies such as National Vendors, Automatic Products, and RMI, which have in fact captured large market shares while Vendo's market position has deteriorated. Indeed, plaintiffs concede that Automatic Products was unhindered by Vendo's alleged overt acts. By contrast, in *Kearney & Trecker v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1971 *cert. denied* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972),[9] the overt acts, had they been successful, would have led to control of the market.

■ The primary evidence offered by plaintiffs of Vendo's specific intent to establish monopoly power is the inference that plaintiffs would have this court draw that Vendo's negotiation and enforcement of the non–competition covenants were overt acts in furtherance of an attempt to monopolize.[10] However, a specific intent to

to show a violation of § 2, in the absence of predatory conduct. Se also *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.*, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974); *KECO Industries v. Borg-Warner Corp.*, 334 F.Supp. 1240, 1245 -46 (M.D.Pa. 1971), involving disparaging comments about a competitor.

9. Plaintiffs place heavy reliance on *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). Their reliance on that decision is misplaced, for the Seventh Circuit's rationale in that case is directly opposed to plaintiffs' § 2 argument. The Court emphasized that "Plaintiff's actual position in the industry is not . . . the sole test of violation of § 2" (*Id.* at 598). Instead, the dangerous probability test:

> . . . requires an appraisal of the alleged offender's ability to achieve the forbidden result, his intent, and the nature of his overt actions. In an antitrust context we must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market.

452 F.2d at 598.

In the *Kearney & Trecker* case, the overt acts were obtaining two reissues of a patent by violating a federal statute making it a felony for a federal employee to act as an agent for anyone after having participated in the same matter while employed by the Government; the Court found this to be the "use of predatory means to accomplish its purpose". 452 F.2d at 599. Even though the Court found the plaintiff counterdefendant's size "impressive" (*Id.* at 598), the overwhelming consideration was that, had the plaintiff counterdefendant been successful in its efforts, the result would have been to give it control over the relevant market through its patent position by requiring all competitors to either pay royalties or abandon the production of all machines infringing the broad patent claims. *Id.* at 598 n.49.

10. Plaintiffs' reliance on decisions such as *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 425 (10th Cir.), *cert. denied*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952), is plainly misplaced. In that case, it was found that "the real purpose of the infringement action and the incidental activities of Kobe's representatives was to further [Kobe's] existing monopoly and to eliminate Dempsey as a competitor." In addition, the infringement action had been "preceded by a long history of unlawful monopolization." Here, Vendo has never had a monopoly to further and its "real purpose" was not to eliminate anyone as a competitor but instead to obtain protection for its purchase of Stoner Manufacturing and employment of Stoner and compensation for Stoner's established misconduct. In addition, even if one were to accept *arguendo* plaintiffs' unfounded argument that the state court suit was directed against Lektro–Vend, which was not even a defendant in the state court, it was not by any

monopolize cannot be inferred from these acts. As the Ninth Circuit held in *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1145 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974): ". . . the evidence did not disclose that [defendant's] actions were not predominantly motivated by legitimate business objectives. Accordingly, [plaintiffs'] case under Section 2 of the Sherman Act must fail."

Specific intent to monopolize also cannot be inferred from Vendo's acquisitions. There is no evidence that any acquisition was anticompetitive in intent or effect, and given the fact that there was no evidence that Vendo's acquisitions of Vendorlator and Stoner Manufacturing combined harmed competition or injured other competitors, specific intent to monopolize cannot be inferred from them. Similarly, in *United States v. Columbia Steel Co.,* 334 U.S. 495, 533, 68 S.Ct. 1107, 1127, 92 L.Ed. 1533 (1948), the Supreme Court refused to infer specific intent to monopolize from a large acquisition by U.S. Steel; according to the Court, ". . . the acquisition of a firm outlet to absorb a portion of Geneva's rolled steel production seems to reflect a normal business purpose rather than a scheme to circumvent the law."

Finally, no specific intent to monopolize can be inferred from Vendo's alleged policy of requiring and enforcing covenants not to compete. The covenants in the employment and acquisition agreements with Stoner and Stoner Investments, as already discussed, were reasonable in scope and duration as enforced and ancillary to the lawful acquisition and there is no evidence that they had a damaging effect on competition. Furthermore, there is no evidence that other covenants which Vendo obtained or sought to enforce were intended to have or did have a damaging effect on competition or plaintiffs.

█ There was, in short, no proof of "predatory conduct directed to accomplishing the unlawful purpose" of achieving mo-

nopoly power; and without such proof, there can be no § 2 liability. *Chisholm Bros. Farm Equipment, supra,* 498 F.2d at 1144, quoting *Hallmark Industry v. Reynolds Metals Co.,* 489 F.2d 8, 12 (9th Cir. 1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974).

Taking into account Vendo's "capacity to commit the offense the scope of its objective, and the character of its conduct" and more fundamentally its "actual or threatened impact on competition in the relevant market", as *Kearney & Trecker* requires (452 F.2d at 598), plaintiffs' § 2 contention must be rejected.

█ While at first blush plaintiffs § 7 Clayton Act claim may appear to be meritorious, plaintiffs have failed to establish the adverse market impact of Vendo's acquisition of Stoner Manufacturing.

Contrary to plaintiffs' contention, as this court views the evidence presented, it appears that rather than "substantially lessening competition" the merger in the instant case, if it affected the relevant line of commerce at all, affected it in such a way as to promote competition.

Nevertheless, in establishing a § 7 violation, plaintiffs must demonstrate an adverse market impact. Plaintiffs have failed to do this. Rather, they have proffered statistics, which while sufficient to withstand a motion to dismiss, do not establish a substantial lessening of competition.

The fact that Stoner was able to take the money he received from his sale of Stoner Manufacturing and his employment with Vendo and set up Lektro–Vend, a new vending machine manufacturer, which plaintiffs contend could have been a significant competitor, does not satisfy plaintiffs burden that Vendo's acquisition of Stoner Manufacturing substantially lessened competition.

Plaintiffs have not adduced the slightest evidence of any anticompetitive effects of the acquisition. Indeed, the evidence is to

standard a major competitor and any impact of the suit on Lektro--Vend could not possibly

result in Vendo's having a monopoly or a dangerous probability of that result.

the contrary. As plaintiffs admit, Stoner's share of the national candy vending machine business had dropped from 71% in 1955 to only 31% at the time of the acquisition in 1959. And, as the Illinois Supreme Court found, during 1959 to 1969 following the acquisition, Vendo's share of this business declined from 31% to approximately 16%.

Plaintiffs have erred in assuming that even a true horizontal merger can be condemned merely on the basis of statistical evidence of market shares. Such an approach has been repeatedly condemned by the Supreme Court and other federal courts, including the Seventh Circuit.

As the Supreme Court held in *Brown Shoe Co. v. United States*, 370 U.S. 294, 321–322, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962), "... Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry," and "... only a further examination of the particular market–its structure, history and probable future–can provide the appropriate setting for judging the probable anticompetitive effect of the merger." 370 U.S. at 322 n.38, 82 S.Ct. at 1522 n.38.

On that basis, in *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), affirming Judge Robson's dismissal of a Government § 7 action, the Supreme Court held that

> ... the District Court was justified in viewing the statistics relied on by the Government as insufficient to sustain its case. Evidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete .... Thus, companies that have controlled sufficiently large shares of a concentrated market are barred from merger by § 7, not because of their past acts, but because their past performances imply an ability to continue to dominate with at least equal vigor.
> * * * * * *
> Irrespective of the company's size when viewed as a producer, its weakness as a competitor was properly analyzed by the

District Court and fully substantiated that court's conclusion that its acquisition by Material Service would not 'substantially ... lessen competition....'

415 U.S. at 501, 503–504, 94 S.Ct. at 1195.

Notwithstanding the Government's proof in that case that the merger resulted in a combined market share of nearly 22%, the Supreme Court concluded:

> Irrespective of the markets within which the acquiring and the acquired company might be viewed as competitors for purposes of this § 7 suit, the Government's statistical presentation simply did not establish that a substantial lessening of competition was likely to occur in any market.

415 U.S. at 511, 94 S.Ct. at 1200.

Similarly, the following year in *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 120, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975), the Supreme Court rejected the Government's § 7 claim on the ground that "the market–share statistics gave an inaccurate account of the acquisition's probable effects on competition."

And, in *United States v. International Harvester Co.*, 564 F.2d 769 (7th Cir. 1977), the Seventh Circuit rejected a similar § 7 attack based on statistical grounds. The combined market shares resulting from the merger were 25% (19% plus 6%) and 34% (27% plus 7%). Nevertheless, relying on *General Dynamics, supra*, the Court held that "the market share statistics gave an inaccurate account of the acquisition's probable effects on competition" and "that the Government's past market statistics are insufficient to constitute a *prima facie* case." 564 F.2d at 773–774. See also, e. g., *United States v. Tidewater Marine Service, Inc.*, 284 F.Supp. 324, 343 (E.D.La.1968) ("A horizontal merger such as this is not *per se* a violation of § 7" even though the merging firms were assumed to have a combined market share of 31%); *United States v. M.P.M., Inc.*, 1975–1 Trade Cases ¶ 60,312 (D.Colo.) at pp. 66,242–45 (horizontal merger upheld despite 31.6% combined market share); *United States v. Consolidated Foods Corp.*, 1978–1 Trade Cases ¶ 62,063 (E.D. Pa.).

In the instant case, whether we view the statistics of the "Vendo–served market" or the market as a whole, this court does not find a substantial lessening of competition given the other relevant circumstances. In the period preceding the acquisition, Stoner Manufacturing's sales had been slipping rapidly because of Stoner's serious health problems, Adelberg's death, and the lack of management depth–factors indicating the possibility if not the probability of Stoner Manufacturing's falling by the wayside or of losing substantially its competitive position. And, since the acquisition, Vendo's competitive position has significantly deteriorated.

This court views these changes as being of importance, particularly in light of the Seventh Circuit's comments in *International Harvester*, 564 F.2d at 773–774, which we find directly applicable to the instant case:

> To the extent that the Government's criticism is aimed instead at the type of evidence used by the district court to overcome this presumption, we disagree. In responding to a statistical showing of concentration and in concluding that Section 7 was not violated, Judge Leighton properly considered evidence of Steiger's 'weakness as a competitor.' *United States v. General Dynamics*, 415 U.S. 486, 503, 94 S.Ct. 1186, 39 L.Ed.2d 530. In fact, characterized in either one of two ways, this evidence is precisely the kind of information into which the Supreme Court in recent cases has mandated an inquiry. See *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 120, 95 S.Ct. 2099 [2118], 45 L.Ed.2d 41; *United States v. Marine Bancorporation, supra* [418 U.S.], at 631, 94 S.Ct. 2856; *United States v. General Dynamics, supra* [415 U.S.], at 497–498, 94 S.Ct. 1186 [1193–1194]; *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 n. 38, 82 S.Ct. 1502 [1522 n. 38], 8 L.Ed.2d 510. First, the evidence can be viewed as showing that "the market–share statistics gave an inaccurate account of the acquisitions' probable effects on competition." *United States v. Citizens & Southern National Bank, supra* [422 U.S.], at 120, 95 S.Ct. at

2118, citing *United States v. General Dynamics, supra* [415 U.S.], at 497–98, 94 S.Ct. 1186 [1193–1194]. This showing, which has been called the *"General Dynamics* defense," establishes that the Government's past market statistics are really insufficient to constitute a *prima facie* case because Steiger's weak financial reserves (like United Electric's weak coal reserves in *General Dynamics*) would not allow it to be as strong a competitor as the bald statistical projections indicate. Second, the evidence is appropriate to the related proposition that even accepting the statistics as the primary index of market power, "only a further examination of the particular market–its structure, history and probable future can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Brown Shoe v. United States, supra* [370 U.S.], at 322 n. 38, 82 S.Ct. at 1522, quoted in *United States v. General Dynamics, supra* [415 U.S.], at 498, 94 S.Ct. 1186 [1194]. Viewed in this light and focused more directly on the ultimate conclusion, the *prima facie* case presented by the Government was rebutted by persuasive evidence, including Steiger's weakened financial condition, indicating that "no substantial lessening of competition occurred or was threatened." 415 U.S. at 498, 94 S.Ct. at 1194. Thus even though the defendants do not rely on the failing–company doctrine, which is a valid defense to a Section 7 suit, they have shown that even if Steiger remained in the market, it did not have sufficient resources to compete effectively, and this supports the district court's conclusion that the acquisition of 39 per cent of Steiger's stock by Harvester would not substantially lessen competition. See 415 U.S. at 508, 509–510, 94 S.Ct. 1186 [1199–1200].

Despite plaintiffs speculative contentions that Lektro–Vend, absent Vendo's enforcement of the non–competition covenants exacted from Stoner and Stoner Manufacturing, could have become a significant competitor as a manufacturer of vending ma-

chines, it is highly doubtful in this court's opinion that Lektro–Vend would have even been established had it not been for the money Stoner obtained from Vendo's acquisition of the failing Stoner Manufacturing and the employment of Stoner.

Plaintiffs assertion that the 1959 acquisition was an illegal product extension merger under § 7 of the Clayton Act also fails.

Plaintiffs ignore the Supreme Court's requirements for establishing an illegal market–extension merger. One of the Court's more recent decisions involving the potential competition doctrine is *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). In affirming the district court's dismissal of the Government's complaint, the Court explained the elements of proof to be established in a potential competition case and held that the Government had not met its burden. First, the market involved must be a concentrated one in which "there are dominant participants in the target market engaging in interdependent or parallel behavior and with the capacity effectively to determine price and total output of goods or services." 418 U.S. at 630, 94 S.Ct. at 2874. Second, the acquiring company must be the most likely entrant or one of a small number of possible potential entrants. And third, for the perceived potential entrant theory to apply, the company must have had the characteristics, capabilities, and economic incentives to render it a perceived potential *de novo* entrant and *its premerger presence on the fringe of the target market must be shown to have in fact tempered oligopolistic behavior on the part of existing participants in the market.* 418 U.S. at 624–25, 94 S.Ct. at 2871.[11]

The difficulty of meeting these criteria has resulted in almost uniform rejection of potential competition theories in market extension cases subsequent to *Marine Bancorporation.* See *Federal Trade Commission v. Atlantic Richfield Co.*, 549 F.2d 289, 293–98 (4th Cir. 1977); *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 860–66 (2d Cir.), *cert. denied*, 419 U.S. 833, 94 S.Ct. 3210, 41 L.Ed.2d 1161 (1974); *BOC International, Ltd. v. Federal Trade Commission*, 557 F.2d 24, 26–30 (2d Cir. 1977); *United States v. Consolidated Foods Corp.*, 1978–1 Trade Cases ¶ 62,063 (E.D.Pa.); *United States v. Hughes Tool Co.*, 415 F.Supp. 637, 645–46 (C.D.Cal.1976); *United States v. Black & Decker Mfg. Co.*, 430 F.Supp. 729 (D.Md.1976); *Federal Trade Commission v. Tenneco, Inc.*, 1977–1 Trade Cases ¶ 61,449 (D.D.C.1977); *United States v. Amax, Inc.*, 402 F.Supp. 956, 959–60 (D.Conn.1975); *Budd Co.*, 86 F.T.C. 518 (1974).

In this case, the plaintiffs have made no showing whatever that Vendo's premerger presence on the fringe of the candy vending machine market did in fact temper oligopolistic behavior on the part of existing participants in the market. Instead, without even citing *Marine Bancorporation* and the other key potential competition cases applying the *Marine Bancorporation* tests, plaintiffs ask this court to hold the 1959 acquisition illegal merely on the basis of alleged "striking parallels" to a pre–*Marine Bancorporation* case, *Federal Trade Commission v. Proctor & Gamble Co.*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). These alleged "striking parallels" do not in fact

---

11. The Court in *Marine Bancorporation* did not resolve the question of whether Section 7 of the Clayton Act proscribed a merger solely on the ground that it might eliminate the prospect for future deconcentration that might result if the acquiring firm were forbidden to enter the market other than by *de novo* entry or a toe -hold acquisition. The Court did hold, however, that if *any* such "actual potential entrant" theory were to apply, it must be shown–in addition to the first two elements of proof set forth in the test (i. e., that the target market be characterized by oligopolistic market structure, conduct and performance, and that the acquiring company be the most likely entrant or one of a small number of possible potential entrants)-- not only that the potential competitor had available "feasible means" for entry other than the challenged acquisition, but also that those means offered a substantial likelihood of producing a deconcentration of the target market or "other significant procompetitive effects" (418 U.S. at 633, 294 S.Ct. at 2875). These elements were not established in the *Marine Bancorporation* case (p. 639, 94 S.Ct. p. 2878), and they have not been established in this case. See also *BOC International, Ltd. v. Federal Trade Commission*, 557 F.2d 24 (2d Cir. 1977).

exist, and furthermore in *Proctor & Gamble* the Supreme Court specifically found that it was "clear that the existence of Proctor & Gamble at the edge of the industry exerted considerable influence on the market." 386 U.S. at 581, 87 S.Ct. at 1231. This finding, specifically reaffirmed as a requirement in *Marine Bancorporation*, cannot be made in the instant case.

Furthermore, at the time of its acquisition of Clorox, P & G was the largest user of television advertising in the United States, with an advertising and sales promotion budget in excess of $127 million. Clorox was the leading manufacturer of household liquid bleach (with 48.8% of the highly concentrated national liquid bleach market and a significantly higher market share which "approached monopoly proportions in certain areas"), and its market share also had been steadily increasing for the five years prior to the merger. In addition, Clorox was the only bleach manufacturer selling on a national basis. 386 U.S. at 571, 573, 87 S.Ct. at 1227. One of the principal reasons for Clorox's dominant position was its heavy advertising and sales promotions. For example, in the year of the merger, Clorox had spent more than 10% of its total sales on advertising. 386 U.S. at 572, 87 S.Ct. at 1227. In addition, the Court observed that substantial advertising advantages would have been available to Clorox through P & G because, at the time, the major television networks offered discounts based on volume advertising and therefore P & G would be able to give each of its products network exposure at a fraction of the cost per product that a firm with only one product to advertise would have incurred. 386 U.S. at 579, 87 S.Ct. at 1230.

In the instant case, not only can there be no finding of actual "edge effect" resulting from Vendo's potential competition, but there is no evidence that advertising has ever played a significant role in the sale of vending machines. Unlike the P & G/Clorox merger, the Stoner acquisition has not been shown to raise entry barriers. Indeed, the market position of the combined firm *declined* after the acquisition took place while the market share of other competitors increased.

In sum, this court concludes that plaintiff has failed to meet its burden of proof on any of the alleged federal anti–trust claims.

Accordingly, it is ordered that a judgment be and the same is hereby entered in favor of defendant, Vendo. Consequently, the state court judgments stand.